UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES E. PIETRANGELO, II,

    *Plaintiff*,

v.

REFRESH CLUB, INC., *et al.*,

    *Defendants.*

No. 18-cv-1943 (DLF)

## MEMORANDUM OPINION

Plaintiff James E. Pietrangelo, II, proceeding *pro se*, filed a complaint against Refresh Club, Inc. and The Wing DC, LLC (collectively, The Wing), seeking monetary, injunctive, and declaratory relief for alleged violations of the D.C. Human Rights Act of 1977 (DCHRA), D.C. Code §§ 2–1401.01 *et seq.* Dkt. 1. Before the Court is the defendants' Motion to Dismiss. Dkt. 11. For the reasons that follow, the Court will deny the motion.

## I. BACKGROUND

The Wing is an emerging "network of work and community spaces" that offers its members a forum for meeting and working, as well as other amenities and programming. Defs.' Br. at 1, Dkt. 11. The company[1] was founded in 2016. *Id.* at 3. In addition to physical work and meeting space, The Wing provides its members with on-site dining, gym, and shower facilities, plus meditation rooms and library services. Compl. ¶ 11(1)(h).[2] In this way, The Wing

---

[1] The parties dispute whether The Wing is a private club or a place of public accommodation, *see* Compl. ¶¶ 10–11, but that dispute is irrelevant to the defendants' motion to dismiss. Any references to The Wing as a "company" or other entity should not be construed in any way as resolving that dispute.

[2] The complaint contains two paragraph 11s, which the Court will refer to as 11(1) and 11(2).

resembles other co-working networks such as WeWork (one of The Wing's major investors). *Id.* ¶ 11(1)(c). Yet The Wing differs from more traditional co-working spaces in that it is specifically designed for and marketed to women. Defs.' Br. at 1–3. For example, The Wing offers screenings of female-directed films and presentations by prominent female politicians. Compl. ¶ 11(1)(h); Defs.' Br. at 3. And it sells tickets to public events such as "Friday Night Feminism." Compl. ¶ 11(1)(w). The Wing also produces its own print magazine called *No Man's Land*. *Id.* ¶ 11(1)(x).

At the time this action was filed, The Wing operated facilities in New York City and Washington, D.C., and had arrangements to open additional locations in the coming years. *Id.* ¶ 8. To gain admission to The Wing, aspiring members were required to answer a few questions in an online application[3] and pay between $215 and $250 per month. *Id.* ¶¶ 11(1)(k), (ll). As of September 2018, more than 26,000 people had applied to become members. Gelman Decl. ¶ 4, Dkt. 11-3. As of the filing of the plaintiff's complaint, The Wing had over 1,500 members across all its locations, and at least 349 of those members used the D.C. location. Compl. ¶¶ 11(1)(hh), (kk).

Pietrangelo lives in D.C., where he spends his time writing. *Id.* ¶ 15. Finding his apartment complex an unsuitable venue for his work, Pietrangelo applied for membership at The Wing's D.C. location on June 4, 2018. *Id.* ¶¶ 16–18. The next day, he spoke over the phone with two employees of The Wing who informed him that his application would be permanently deferred because the company offered membership exclusively to women. *Id.* ¶¶ 21–23. To this

---

[3] The Wing's online application asks prospective members, among other things, "why the applicant wants to join The Wing, how the applicant has supported women, and what the biggest challenge facing women today is." Compl. ¶ 11(ll). The application also asks prospective members to submit a social-media profile, which the plaintiff alleges is used to discover the applicant's sex or gender identify. *Id.* ¶¶ 11(ll)–(mm).

day, Pietrangelo continues to be constructively denied membership through a permanent deferral of his application.  *Id*. ¶ 23.

On August 20, 2018, Pietrangelo brought this action for unlawful sex discrimination. Dkt. 1.  He argues that The Wing is a "place of public accommodation" under the DCHRA and that it unlawfully discriminated against him on account of his gender.  Compl. ¶¶ 9–11(2). Pietrangelo repeatedly urges that, at the time he submitted his application, it was both the practice and policy of The Wing to exclude men from its membership.  *See, e.g.*, *id*. ¶¶ 9, 11(2).

The Wing denies that its discriminatory practice had any impact on Pietrangelo.  At the time Pietrangelo applied, The Wing claims it evaluated applicants primarily based on their ostensible "commitment to The Wing's mission—*i.e.*, the advancement of women."  Defs.' Br. at 4.  Thus, according to The Wing, Pietrangelo would have been denied admission regardless of his gender because of his failure to demonstrate a sufficient commitment to the company's mission of female community and empowerment.  *Id*. at 2, 7.  As proof, The Wing offers Pietrangelo's membership application.  Martinelli Decl. Ex. 1, Dkt. 15-2.[4]  The Wing argues that because of its "highly selective" screening process—under which only eight percent of applicants are granted membership—Pietrangelo would have been denied admission even if The Wing had not considered his gender.  *See* Defs.' Br. at 3–4, 10–14.

The Wing concedes that its "practice" when Pietrangelo applied for membership was to admit "only women and non-binary individuals."  *Id*. at 5; *see also* Gelman Decl. ¶ 6.  But in

---

[4] In response to the question, "Why do you want to become a member of The Wing?" Pietrangelo noted that it "[l]ook[ed] like a great place to work and network in a nurturing environment."  *See* Martinelli Decl. Ex. 1.  When asked "[h]ow [he had] promoted or supported the advancement of women" he responded that he had "always supported and advocated for equality for all people."  *Id*.  When asked what he thought was the "biggest challenge facing women today" he replied: "[t]he same challenges facing men."  *Id*.

August 2018, shortly after this action was filed, The Wing adopted a formal written policy to govern its admissions practices. Gelman Decl. ¶ 7. The new policy "provides that all applicants will be evaluated based on their commitment to The Wing's mission, regardless of their perceived gender or gender identity." *Id.* The Wing updated its website to reflect the new policy and made plans to begin training its employees to implement the policy in October 2018. *Id.* ¶¶ 8–9. Aside from these two steps, the extent to which the policy has actually been implemented or applied remains uncertain.

On September 26, 2018, The Wing filed a motion to dismiss pursuant to Rule 12(b)(1) in which it advances three arguments related to this Court's jurisdiction. *First*, The Wing asserts that Pietrangelo lacks standing because he failed to draw a causal connection between his injuries and the defendants' alleged exclusionary practice. Defs.' Br. at 10. *Second*, The Wing argues that Pietrangelo has failed to properly plead diversity jurisdiction because his claim for monetary damages does not satisfy the amount in controversy requirement. *Id.* at 14. *Third*, The Wing claims that its newly formulated membership policy renders Pietrangelo's claims moot. *Id.* at 18.[5]

---

[5] After briefing on the motion to dismiss, Pietrangelo filed four motions asking this Court to take judicial notice of various news articles, social-media posts, and websites. Dkts. 17, 18, 19, 20. Because the defendants did not oppose these motions within the time provided in Local Civil Rule 7(b), the Court will grant them as conceded. *See* Local R. Civ. P. 7(b) (if a party declines to file a memorandum in opposition to a motion within fourteen days of service or such other time as the Court directs, "the Court may treat the motion as conceded"). Ultimately, however, these materials are not necessary to the Court's decision, and the Court cites them below only to the extent they include admissions by a party opponent and only for the limited purpose of shedding additional light on the likelihood that The Wing might revert to its former practice of excluding men despite its new policy to the contrary. *See infra* n.10.

## II.     LEGAL STANDARD

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move to dismiss an action or claim when the court lacks subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A motion for dismissal under Rule 12(b)(1) "presents a threshold challenge to the court's jurisdiction."  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  Federal district courts are courts of limited jurisdiction, and it is "presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Thus, "the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence."  *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

"When ruling on a Rule 12(b)(1) motion, the court must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (internal quotation marks omitted).  Those factual allegations, however, receive "closer scrutiny" than they would if the court were considering a Rule 12(b)(6) motion for failure to state a claim.  *Id.*  Also, unlike in the Rule 12(b)(6) context, a court may consider documents outside the pleadings to evaluate whether it has jurisdiction.  *See Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  If, at any point, the court determines that it lacks jurisdiction, the court must dismiss the claim or action.  Fed. R. Civ. P. 12(b)(1), 12(h)(3).[6]

---

[6] Although the defendants seek dismissal with prejudice, "a Rule 12(b)(1) dismissal for lack of jurisdiction generally is not a decision on the merits and therefore should be without prejudice." *Montgomery v. Comey*, 752 F. App'x 3, 5 (D.C. Cir. 2019) (per curiam).

### III.    ANALYSIS

####    A.    Standing

To establish standing, a plaintiff must demonstrate (1) a concrete injury-in-fact that is (2) fairly traceable to the defendant's action and (3) redressable by a favorable judicial decision. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). A court "has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Id.* at 499. If standing does not exist, the court may not "step[] where the Constitution forb[ids] it to tread" by addressing the merits. *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016). When evaluating whether a plaintiff has standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501 (1975).

The Wing contends that Pietrangelo's claim fails at the second step—traceability—because he has not alleged but-for causation. In The Wing's words, Pietrangelo "has not properly pleaded that he would have been admitted [to The Wing] absent the alleged gender discrimination and thus has not pleaded that the allegedly discriminatory policy caused him any injury." Defs.' Br. at 2. This argument fails for three reasons.

*First*, the Complaint *does* allege that The Wing refused to admit Pietrangelo because of—and solely because of—his sex. Although the complaint does not use the familiar label "but-for" causation, it alleges that The Wing denied Pietrangelo access to The Wing "*simply* because he is a man," Compl. ¶¶ 25, 26 (emphasis added), and that "[t]here was no legitimate, non-discriminatory reason or basis" for its decision, *id.* ¶ 29; *see also id.* ¶ 21 (alleging that a representative of The Wing informed Pietrangelo that he "would *automatically* be denied membership by The Wing *simply* because he is a man" (emphases added)).

The Wing disagrees, arguing that Pietrangelo's "own description of his application (as well as his answers to the questions on the application) make clear that he would not have been admitted regardless of the alleged gender discrimination." Defs.' Br. at 11. But the Wing assumes too much. At this stage, Pietrangelo's allegations must be presumed true, and all reasonable inferences from those allegations must be drawn in his favor. Even if it turns out to be true that Pietrangelo would have been denied membership in the Wing in the absence of a discriminatory policy, that factual question is not for the Court to resolve on a motion to dismiss. Although it is true that allegations receive "closer scrutiny" on a Rule 12(b)(1) motion than they would if the Court were considering a Rule 12(b)(6) motion for failure to state a claim, *Jeong Seon Han*, 223 F. Supp. 3d at 103, it is equally true that courts must avoid resolving issues contested on the merits under the banner of standing, *see, e.g.*, *Schnitzler v. United States*, 761 F.3d 33, 40 (D.C. Cir. 2014) ("[I]n reviewing the standing question, the court must . . . assume that on the merits the plaintiffs would be successful in their claims." (internal quotation marks omitted)); *Safe Food & Fertilizer v. EPA*, 350 F.3d 1263, 1267 (D.C. Cir. 2003) ("[W]here plaintiffs' merits claim, if correct, would establish causation for standing purposes, that element of standing is deemed adequately shown[.]" (citation omitted)); *Ass'n of Am. R.R.s v. Dep't of Transp.*, 38 F.3d 582, 585 (D.C. Cir. 1994) (to establish standing, a party need only make "colorable legal arguments that the injury" complained of was "caused by" the defendant's conduct); *Public Citizen v. FTC*, 869 F.2d 1541, 1549 (D.C. Cir. 1989) (cautioning that parties may not "bootstrap standing analysis to issues that are controverted on the merits"). That is particularly true where, as here, the plaintiff has not yet had the benefit of discovery, and the factual record remains incomplete. *See Kern v. United States*, 585 F.3d 187, 193 (4th Cir. 2009)

("[W]hen the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery[.]").

Pietrangelo has adequately alleged that the sole reason for his exclusion from The Wing was his gender and that no other, non-discriminatory reason justified that exclusion. Naturally, The Wing disputes this allegation. But even assuming that Pietrangelo's application failed to establish a commitment to The Wing's mission, it is far from clear at this stage that The Wing would have viewed such a failure as a significant selection criterion at the time Pietrangelo applied. Indeed, it is not even clear that The Wing applied any criteria other than gender in evaluating prospective members. Although the complaint alleges that The Wing had many more applicants than members, *see* Compl. ¶¶ 11(1)(hh), (kk), it also alleges that the application process "was not rigorous or (significantly) selective," *id.* ¶ 11(1)(ll), and that "there [wa]s little to no real investigation of applicants before they [we]re granted membership," *id.* ¶ 11(1)(yy). More to the point, the complaint alleges that "The Wing's only real membership criteria [wa]s being or identifying as a woman" and that "the membership device" itself "[wa]s simply a subterfuge to illegally exclude men." *Id.* ¶ 11(1)(zz). As a result, the complaint alleges that "all or virtually all . . . women who appl[ied] for membership in The Wing [we]re either granted membership or [we]re put on waiting lists due to building capacities and [would be] eventually granted membership." *Id.* ¶ 11(1)(aaa).

The Wing disputes these allegations and asserts in its motion that at the time Pietrangelo applied, "the primary criterion for membership was an applicant's commitment to The Wing's mission[.]" Defs.' Br. at 4. But that assertion cannot be squared with the allegations in the complaint. Nor is it supported by The Wing's declarations, which concede that when Pietrangelo applied, "The Wing's practice was to admit as members only women and non-binary

individuals" and that The Wing adopted a formal policy of evaluating candidates "based on their commitment to The Wing's mission" only *after* Pietrangelo filed this suit.  Gelman Decl. ¶¶ 6–7; *see also id.* ¶ 9 (stating that The Wing's employees would not be trained on this new admissions policy until October 2018, four months after Pietrangelo was denied admission).  In short, the extent to which The Wing actually evaluated its prospective members' commitment to women— as opposed to their status as women—remains a contested issue central to the merits that the Court cannot resolve at the motion-to-dismiss stage.

*Second*, even if Pietrangelo had failed to allege but-for causation, it would not make a difference because the DCHRA permits recovery where discrimination is merely one factor among several in denying an individual access to public accommodations.  *See* D.C. Code Ann. § 2-1402.31 (prohibiting the denial of public accommodations "*wholly or partially* for a discriminatory reason based on" a person's "actual or perceived[] . . . sex, . . . gender identity or expression" (emphasis added)).  "[U]nder the DCHRA," a plaintiff "may prevail by proving that the [defendant's] action was motivated 'partially' by a discriminatory reason, even if it also was motivated by permissible reasons not, in themselves, pretextual."  *Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008).  Thus, to prevail under the DCHRA, Pietrangelo need only show that his gender was a reason for his exclusion—not that it was the sole or dispositive reason.

The Wing counters that it is irrelevant that "local law" permits recovery without but-for causation because the question for standing purposes is what level of causation the Constitution requires.  Defs.' Reply at 1, Dkt. 15.  But the Court is not aware of any authority suggesting that Article III's traceability requirement imposes a constitutional floor of "but-for" causation in every case, regardless of the level of causation required to prevail on the merits.  *See Nat'l Treasury Employees Union v. Whipple*, 636 F. Supp. 2d 63, 73 (D.D.C. 2009) ("[Article III] does

not require that the challenged action must be the 'sole' or 'proximate' cause of the harm suffered, or even that the action must constitute a 'but-for cause' of the injury[.]" (internal quotation marks omitted)). To the contrary, in several contexts, the Supreme Court and D.C. Circuit have expressly rejected standing challenges to claims premised on causation theories that fall short of the strict but-for standard The Wing urges here. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 523 (2007) (standing established where an agency's refusal to act "contribute[d]" to the plaintiff's injuries); *Cmty. for Creative Non–Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir. 1987) (standing established where a defendant's actions served as "a substantial factor motivating [a] third part[y's] actions"); *Am. Rivers v. FERC*, 895 F.3d 32, 42 (D.C. Cir. 2018) (explaining that a plaintiff who challenges an agency's failure to follow a legally mandated procedure "need demonstrate only that the procedural step was connected to the substantive result, not that the agency would have reached a different substantive result but for the alleged procedural error" (internal quotation marks omitted)).[7]

*Third*, The Wing focuses exclusively on Pietrangelo's denial of admission as the relevant injury-in-fact but ignores the numerous other injuries alleged in his complaint, including the "indignity, embarrassment, humiliation, pain, suffering, mental anguish, and/or loss of

---

[7] Moreover, federal courts have repeatedly applied Title VII's analogous "mixed-motive" or "motivating-factor" standard without ever suggesting that they might lack subject-matter jurisdiction to enforce it. *See, e.g.*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 173–74 (2009) (explaining that Title VII provides relief where "an improper consideration was a motivating factor for an adverse employment decision" even if "other factors also motivated the practice" (internal quotation marks omitted)); *Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008) (explaining that a plaintiff "may bring a mixed-motive case" under Title VII "in which he does not contest the *bona fides* of the employer's justifications but rather argues race was also a factor motivating the adverse action" (internal quotation marks omitted)). Likewise, the D.C. Court of Appeals has never suggested that it lacks jurisdiction to enforce the DCHRA's "partial" discrimination standard, even though it "look[s] to federal standing jurisprudence" for guidance in applying its own case-or-controversy requirement. *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1206 (D.C. 2002) (internal quotation marks omitted)).

enjoyment of life" he allegedly experienced as "a direct and proximate result of The Wing's intentionally discriminatory policies, practices, acts, and conduct." Compl. ¶ 30; *see also id.* ¶ 27 (alleging that The Wing's "policies" and "statements" "demeaned" Pietrangelo and made him "literally [feel] like a second-class citizen"). These stigmatic injuries do not turn on Pietrangelo's exclusion from or admission to The Wing. *See, e.g.*, *Heckler v. Mathews*, 465 U.S. 728, 738 (1984) (male plaintiff established injury-in-fact based on stigmatic harm inflicted by a statute that "subject[ed] him to unequal treatment . . . solely because of his gender" even though he had no hope of obtaining the statutory benefit provided to women). Rather, Pietrangelo's emotional and dignitary injuries arise from his subjection to a discriminatory policy that, at the very least, prevented him from competing for membership in The Wing on a level playing field. *See Lutheran Church-Missouri Synod v. FCC*, 154 F.3d 487, 493 (D.C. Cir. 1998) ("[T]he alleged victim of unequal treatment does not have to prove that the challenged policy was the 'but for' cause of his injury; the claim that the litigant was denied equal treatment is sufficient to constitute Article III 'injury in-fact.'"); *see also Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993) ("When the [defendant] erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.").

The two out-of-circuit cases on which The Wing relies do not require a different result. *See Yeager v. General Motors Corp.*, 265 F.3d 389 (6th Cir. 2001); *Pugsley v. Police Dep't of Boston*, 472 Mass. 367 (Mass. 2015). Neither case involved mixed-motive or motivating-factor discrimination. Nor did the plaintiffs seek recovery for emotional injuries separate and apart from the benefit (employment) ultimately withheld as a result of the challenged selection

process.  In any event, the defendants in both cases selected candidates based on rigid, numerical criteria that conclusively demonstrated that the plaintiffs could not have obtained a position even on a level playing field.  *See Yeager*, 265 F.3d at 395 (emphasizing that the defendant "hired fifty apprentices," and at least "fifty candidates with higher unadjusted [test] scores outranked [the plaintiff]"); *Pugsley*, 472 Mass. at 371–72 (emphasizing that the defendant would have had to hire "eighty-five candidates ranked ahead of the plaintiff on [an] eligibility list" before considering him for a position).  Here, by contrast, the parties dispute whether The Wing actually applied any non-discriminatory criteria when considering applicants, and the only neutral criterion The Wing points to (commitment to the advancement of women) is subjective and potentially correlated with gender, raising factual questions of pretext that cannot be resolved on a motion to dismiss.

In short, Pietrangelo did allege but-for causation.  But he was not required to under the DCHRA or Article III.  And, at any rate, he seeks to vindicate stigmatic injuries that do not rise or fall on his admission to or exclusion from The Wing.  For any one or all of these reasons, his claim must proceed.

  **B.**  **Amount in Controversy**

The Wing next argues that "Plaintiff has failed to meet his burden [of establishing the amount-in-controversy requirement] to support diversity jurisdiction."  Defs.' Br. at 15.  The Court disagrees.

To invoke a court's diversity jurisdiction, the value of a claim must exceed $75,000.  28 U.S.C § 1332(a).  Further, "[w]hen a plaintiff invokes federal-court jurisdiction, the plaintiff's amount-in-controversy allegation is accepted if made in good faith."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553 (2014); *see also Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 276 (1977) ("The sum claimed by the plaintiff controls if the claim is

apparently made in good faith." (alteration adopted and internal quotation marks omitted)). "It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction." *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938).

According to The Wing, Pietrangelo "alleges in conclusory fashion that he is entitled to $12 million in compensatory and punitive damages[.]" Defs.' Br. at 15. But Pietrangelo elsewhere requests relief "in excess of $75,000," Compl. at 30, and the Court need not accept the outer boundary of Pietrangelo's claim for damages to conclude that he has alleged over $75,000 in damages in good faith, *see Info. Strategies, Inc. v. Dumosch*, 13 F. Supp. 3d 135, 140 (D.D.C. 2014) ("Even a cursory allegation of the amount in controversy, if it exceeds the jurisdictional requirement, is sufficient to evade dismissal." (citations and internal quotation marks omitted)). Therefore, Pietrangelo's request for monetary damages satisfies the amount-in-controversy requirement unless it appears "to a legal certainty that the claim is really for less than the jurisdictional amount[.]" *St. Paul*, 303 U.S. at 289.

The Wing suggests that "[n]othing in the Complaint provides any plausible basis for asserting that the damages from the inability to access The Wing . . . were anything more than *de minimis*, let alone in excess of $75,000." Defs.' Br. at 15. But, in doing so, The Wing focuses primarily on a single injury—Pietrangelo's inability to obtain a suitable co-working space—and underestimates the potential value of his emotional damages and other relief.

Another district judge on this Court recently addressed this very issue in a case arising under the DCHRA and D.C. Family Medical Leave Act, D.C. Code § 32–503(a). *See Parker-Williams v. Charles Tini & Assocs., Inc.*, 53 F. Supp. 3d 149 (D.D.C. 2014). After the defendant

13

there sought removal to federal court, the plaintiff filed a motion to remand on the grounds that she had not satisfied the amount-in-controversy requirement. *Id*. at 151. The court found the requirement satisfied despite the fact that the complaint only requested damages "in excess of $5,000." *Id*. The court explained,

> The compensatory damages alone may be sufficient to cross the $75,000 threshold. While Plaintiff argues that this is impossible because her monetary losses were limited to her annual earnings of $27,000, this ignores the fact that she is also demanding damages for emotional pain, suffering, inconvenience, mental anguish, [and] loss of enjoyment of life. While recovery under the DCFMLA is limited to monetary damages, the DCHRA allows for the award of non-pecuniary damages[.]

*Id*. at 152 (citations and internal quotation marks omitted). The plaintiff here requests similar non-pecuniary relief—in an amount "in excess of $75,000"—and The Wing has failed to demonstrate why he cannot recover that amount, to a legal certainty.

The Wing suggests that Pietrangelo cannot recover the jurisdictional amount because the DCHRA empowers the D.C. Human Rights Commission to seek no more than $50,000 in civil penalties in public enforcement actions for violations of the statute. Defs.' Br. at 16. But the statutory provision The Wing cites, D.C. Mun. Regs. Tit. 4 § 212.6, limits only the recovery of civil penalties in enforcement actions initiated by the D.C. Human Rights Commission—not the recovery of compensatory and punitive damages by private plaintiffs. Indeed, courts and juries have awarded damages for DCHRA violations in excess of this $50,000 threshold on numerous occasions. *See, e.g.*, *Martini v. Fed. Nat'l Mortg. Ass'n*, 977 F.Supp. 464, 479 (D.D.C. 1997) (plaintiff in DCHRA gender-discrimination case awarded $100,000 in compensatory damages for "emotional pain and suffering"), *vacated on other grounds*, 178 F.3d 1336 (D.C. Cir. 1999); *Medina v. District of Columbia*, 643 F.3d 323, 325, 328 (D.C. Cir. 2011) (plaintiff in DCHRA race-discrimination case awarded $90,000 in compensatory damages for "emotional distress and humiliation").

Further, even if Pietrangelo's compensatory damages alone were not enough to establish jurisdiction, he also seeks punitive damages that could easily push the value of his claims over the $75,000 threshold. *See Kahal v. J. W. Wilson & Assocs.*, 673 F.2d 547, 549 (D.C. Cir. 1982) (per curiam) (punitive damages can satisfy the amount-in-controversy requirement if they have "a colorable basis in law and fact"). Contrary to The Wing's suggestion, Pietrangelo alleges that The Wing discriminated against him intentionally, with actual malice and evil intent.[8] Pietrangelo could therefore, in theory, be entitled to punitive damages that far exceed any award for actual damages. *Parker-Williams*, 53 F. Supp. 3d at 153 (explaining that "punitive damages are considered a valid and sometimes even integral component of recovery under the DCHRA" and that they are available "if the defendant acts with evil motive or actual malice" (internal quotation marks omitted)). Although no precise mathematical formula governs the degree to which punitive damages must be tethered to compensatory damages, the Supreme Court has acknowledged the historic and widespread use of double, treble, and quadruple damages in various legal contexts, and has suggested that single-digit multipliers will ordinarily be viewed with less suspicion than double-digit multipliers. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).

Finally, in addition to compensatory and punitive damages, Pietrangelo seeks injunctive relief that could require The Wing to incur significant compliance costs—for example, by modifying its marketing materials, retraining its employees, or potentially making physical alterations to its facilities to accommodate men. *See Smith v. Washington*, 593 F.2d 1097, 1099

---

[8] *See, e.g.*, Compl. ¶ 31 ("The Wing's illegal discrimination against Plaintiff as described above was/is egregious: brazen, flagrant, intentional, willful, wanton, actually malicious, motivated by evil and ill-will, deliberately oppressive, outrageous, and willfully and callously disregardful of the rights of Plaintiff."); *id.* ¶ 36 (same); ¶ 45 (same); ¶ 54 (same).

(D.C. Cir. 1978) (in valuing declaratory and injunctive relief for purposes of the amount-in-controversy requirement, courts may look "to the cost to the defendants to remedy the alleged [legal violation]"). The Wing urges the Court not to consider these costs because The Wing already incurred them when it changed its policy voluntarily in August 2018. Defs.' Reply at 11–12 n.7. However, it is well settled that the amount-in-controversy requirement is assessed as of the date the complaint is filed, and "[e]vents occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction." *St. Paul*, 303 U.S. at 289–90; *see also Cuneo Law Grp., P.C. v. Joseph*, 920 F. Supp. 2d 145, 150 (D.D.C. 2013) (distinguishing between "subsequent events that change the amount in controversy and subsequent revelations that, in fact, the required amount was or was not in controversy at the commencement of the action" (internal quotation marks omitted)). Accordingly, the prospect of changing The Wing's practices and policies to conform to the DCHRA must be considered and valued in assessing Pietrangelo's claims.

For all these reasons, it does not appear to a legal certainty that Pietrangelo's claim for damages and other relief is for an amount less than the jurisdictional requirement. Thus, he has properly pled the amount in controversy necessary to establish diversity jurisdiction.

### C. Mootness.

Finally, The Wing asserts that Pietrangelo's claims for injunctive, declaratory, and monetary relief have become moot in light of The Wing's newly adopted membership policy. Defs.' Br. at 19. The policy "provides that members will be selected based on [their] demonstrated commitment to The Wing's mission of the advancement of women, regardless of [their] perceived gender or gender identity." *Id*. at 5–6. The Wing is mistaken.

1.      *Declaratory and Injunctive Relief.*

It is well established that "[u]nder Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). Further, the "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal quotation marks omitted). A claim becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Schmidt v. United States*, 749 F.3d 1064, 1068 (D.C. Cir. 2014) (internal quotation marks omitted).

An important exception this general rule is the doctrine of voluntary cessation. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot."). Under this exception, intervening acts undertaken by the defendant will render a case moot only when there is "no 'reasonable expectation' that the challenged practice will resume after the lawsuit is dismissed." *Jews for Jesus, Inc. v. Hillsborough Cty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). "The defendant carries the burden of demonstrating that there is no reasonable expectation that the wrong will be repeated[.]" *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 648 (D.C. Cir. 2011) (internal quotation marks omitted); *see also Friends of the Earth v. Laidlaw Env'tl Servs.*, 528 U.S. 167, 190 (2000) ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.").

The intervening event said to end the live controversy in this case is The Wing's new membership admissions policy. Yet, at this stage of the proceeding, whether The Wing's new policy has actually cured the alleged discrimination remains in dispute. For example, The Wing's website describes the company as "[a] diverse community open to all." Pl.'s Opp'n at 35 n.21, Dkt. 14. But it contained the same proclamation even before this action was filed—*i.e.*, at the exact time the company concedes that it admitted only female applicants. *Id.* The Wing assures this Court of its recent commitment to equality, citing the "significant time and resources" it has devoted to the adoption and implementation of the new membership policy. Defs.' Reply at 18. However, The Wing has yet to admit any male members or even adapt its facilities to provide a restroom open to men, without which it can hardly be considered a "diverse community open to all." Pl.'s Opp'n at 34–35. Nor does The Wing claim to have reconsidered Pietrangelo's application in light of its new policy, making it useless to him as a practical matter.

In support of its position, The Wing catalogues several cases in which courts have found claims moot in the face of a defendant's voluntary act. *See* Defs.' Br. at 20. But these cases generally concern situations in which a defendant has expended great financial resources to demonstrate its lasting commitment to the change, *see, e.g.*, *Houston v. 7-Eleven*, No. 13-cv-60004, 2014 WL 351970, at *4 (S.D. Fla. Jan. 31, 2014) (structural renovations to business site); *Profil Institut Fur Stoffwechselforschung GbmH v. ProSciento, Inc.*, No. 16-cv-2762, 2017 WL 3575621, at *1 (S.D. Cal. Feb. 22, 2017) (change in company name), or situations in which the efficacy of the intervening change is not in dispute, *see Guelich v. Mounds View Indep. Pub. Sch. Dist. No. 621*, 334 F. Supp. 1276, 1279 (D. Minn. 1972) ("[A]ll the facts taken together make it clear that the burden of meeting [the voluntary cessation] requirement has been met. . . . There

seems to be no question that plaintiff's claims for declaratory and injunctive relief have thus been mooted."); *Nat'l Min. Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001) (similar); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 274 (D.C. Cir. 2001) (similar). Neither situation is the case here. A vague allusion to having spent "significant time and resources" on the adoption and implementation of the new policy is insufficient to support a finding of mootness in light of the disputed evidence already discussed. Because it is not "absolutely clear" that The Wing's newly inaugurated membership policy will prevent further gender discrimination, it cannot be said to moot the claims here. *See Friends of the Earth*, 528 U.S. at 190.[9]

   2. *Monetary Relief.*

Even if Pietrangelo's claims for injunctive and declaratory relief were moot, his claim for damages would remain ripe. It is widely recognized that voluntary cessation of an unlawful act does not moot a viable claim for damages. *See, e.g.*, *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) ("[A] viable claim for damages generally avoids mootness of the action."). Such relief is intended to compensate an injured party for past conduct. Accordingly, The Wing's reliance on *Daskalea v. Washington Human Society*, 710 F. Supp. 2d 32 (D.D.C. 2010) and *Flanigan's Enters. v. City of Sandy Springs*, 868 F.3d 1248 (11th Cir. 2017) is misplaced. In *Daskalea*, the court found the plaintiff's sole claim for damages unviable as a matter of law. 710 F. Supp. 2d at 42. And *Flanigan* analyzed a claim for nominal damages, 868 F.3d at 1264,

---

[9] The possibility that The Wing might revert to its previous practice of excluding men is particularly concerning in light of several recent social-media posts by The Wing or its CEO that suggest to the public that The Wing continues to exclude men even under its new policy. *See, e.g.*, Second Mot. for Judicial Notice, Ex. 3, Dkt. 18 (promoting an event page that describes the Wing as "a place for women and people of all marginalized genders" and urges would-be attendees to "[p]lease note that The Wing is a space for women and nonbinary folks only").

whereas the plaintiff here seeks actual—and significant—damages.  Finally, and contrary to The Wing's assertion, failure to plead economic injury does not moot Pietrangelo's claim for damages.  Defs.' Br. at 21.  The DCHRA expressly permits damages for non-pecuniary injuries, D.C. Mun. Regs. § 4-211.1, such as those allegedly suffered here.  Accordingly, Pietrangelo's claim for monetary damages is not moot.

## CONCLUSION

For the foregoing reasons, the Court denies the defendants' Motion to Dismiss.  The plaintiff's requests for judicial notice are granted as conceded under Local Civil Rule 7(b).  A separate order accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

June 4, 2019