UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES E. PIETRANGELO, II,

*Plaintiff*,

v.

REFRESH CLUB, INC., *et al.*,

*Defendants.*

No. 18-cv-1943 (DLF)

**MEMORANDUM OPINION**

Plaintiff James E. Pietrangelo, II, proceeding *pro se*, filed a complaint against Refresh Club, Inc. and The Wing DC, LLC (collectively, The Wing), seeking monetary, injunctive, and declaratory relief for alleged violations of the D.C. Human Rights Act of 1977 (DCHRA), D.C. Code § 2-1401.01 *et seq.* Dkt. 1. On June 4, 2019, the Court denied The Wing's motion to dismiss. Dkts. 23, 24. Before the Court are Pietrangelo's Motion for (Partial) Summary Judgment, Dkt. 127, and The Wing's Cross Motion for Summary Judgment, Dkts. 128-1, 129. For the reasons that follow, the Court will grant in part and deny in part Pietrangelo's motion and grant in part and deny in part The Wing's cross-motion.

I.      **BACKGROUND**

Before shuttering in 2022, The Wing was an international "chain or 'network' of work and community spaces" that offered members a place to work, eat, connect, and relax. Pl.'s Statement of Material Facts as to Which There Is No Genuine Dispute ¶¶ 1, 4–5 (Pl.'s Statement of Material Facts), Dkt. 127-1; Defs.' Statement of Material Facts ¶ 17 (Defs.' Counter-Statement of Material

Facts), Dkt. 128-3.[1]  The Wing opened in 2016, *see* Pl.'s Statement of Material Facts ¶ 5, and launched a location in the District of Columbia in 2018, *see id.*; Defs.' Counter-Statement of Material Facts ¶ 1.  At its various locations, The Wing offered "a café, a retail store, a day spa . . . a coworking space, a community or exhibition/events space, child-care/facilities, a gym . . . and/or a business-incubator providing venture-capital and business services."  Pl.'s Statement of Material Facts ¶ 5.

Unlike other coworking companies, such as WeWork (an early investor in The Wing), The Wing styled itself as a "[w]omen-only co-working space," *id.* ¶ 42, and "a space for women to . . . connect and support one another," Audrey Gelman Dep. at 76:7–11, Dkt. 128-6.  The Wing "sold a magazine . . . and offered a podcast online," both of which were titled "No Man's Land."  Pl.'s Statement of Material Facts ¶ 36.  The Wing also reproduced its "No Man's Land" slogan in online, print, and billboard advertising.  *Id.* ¶ 39.  On Twitter, The Wing retweeted news reports characterizing the company as a "women-only coworking space and social club," "exclusively reserved for women," and "a space for women and nonbinary folks only."  *Id.* ¶ 42.

The Wing's facilities and services were available only to members, and an individual could apply for membership online.  *See id.* ¶¶ 7, 29.  As of 2018, The Wing required applicants to

---

[1] Unless otherwise noted, the facts in this opinion are drawn from the uncontested facts in the Plaintiff's Statement of Material Facts, Dkt. 127-1, and Defendants' Response to Plaintiff's Statement and separate Counter-Statement, Dkt. 128-3.  *See Hawkins v. District of Columbia*, No. 17-cv-1982, 2020 WL 601886, at *4 (D.D.C. Feb. 7, 2020) ("[I]n ruling on a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted . . . in [the non-moving party's] opposition to the motion." (internal quotation omitted)).  Otherwise, the opinion recounts the facts as established in "depositions, answers to interrogatories, and admissions on file, together with the affidavits" to determine whether there is any "genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing Fed. R. Civ. P. 56).  The opinion notes when the facts are disputed.

explain their interest in The Wing and dedication to "the advancement of women." Diedra Nelson

Dep. 181:18–22, Dkt. 28-22.[2]   The Wing did not ask for an applicant's gender, but the parties

dispute whether The Wing ever asked applicants to provide information about their social-media

accounts.   *Compare* Pl.'s Statement of Material Facts ¶ 67, *with* Defs.' Resp. to Pl.'s Statement

¶ 67.

On June 4, 2018, Pietrangelo, a 53-year-old man living in Washington, D.C., applied for

membership at The Wing's D.C. location.   *See* Pl.'s Statement of Material Facts ¶ 8; James

Pietrangelo Decl. in Supp. of Opp'n to Defs.' Mot. to Dismiss ¶ 5 (James Pietrangelo Decl. 1),

Dkt. 14-1.   In response to the question "Why do you want to become a member of The Wing?"

Pietrangelo stated that The Wing "[l]ooks like a great place to work and network in a nurturing

environment." Decl. of Marianna Martinelli Ex. 1, Dkt. 15-2.   In response to the question "[h]ow

have you promoted or supported the advancement of women?" Pietrangelo answered, "I have

always supported and advocated for equality for all people." *Id.*   In response to the question

"[w]hat do you think is the biggest challenge facing women today?" Pietrangelo replied, "[t]he

same challenges facing men." *Id.*

The following day, Pietrangelo called The Wing DC to inquire about the status of his

application.   Pl.'s Statement of Material Facts ¶ 11.   Pietrangelo spoke with Bee Pollard, a

Community Associate at The Wing DC, *see id.*, and asked whether it "[i]s the policy that men are

not permitted to be members."[3]   Pl.'s Mem. in Opp'n to Defs.' Motion to Compel at 19–20, Dkt.

---

[2] To the extent the Court quotes or describes portions of the record that have been filed under
seal, they are hereby deemed unsealed.

[3] Although The Wing contends that Pietrangelo "mischaracterizes the reason [he] was not
admitted," Defs.' Resp. to Pl.'s Statement ¶ 11, it does not deny the accuracy of Pietrangelo's
transcription of his recorded phone call with Pollard on June 5, 2018, *see* Pl.'s Mem. in Opp'n to
Defs.' Motion to Compel at 19–20 & ex. 1 ¶ 7; *see also* Fed. R. Civ. P. 56(e)(2) ("If a

47.  In a conversation that Pietrangelo recorded, Pollard replied that successful applicants are "self-identifying women, and individuals who don't identify on the gender binary." *Id.*  According to Pollard, The Wing would waitlist Pietrangelo—who identified himself as a man on the call—because "we never reject applications." *Id.*  His application was waitlisted either the same day or the following day.  Helen Dally Dep. at 20:6–7, 18, Dkt. 101-6.

On August 20, 2018, Pietrangelo filed a complaint against The Wing under the DCHRA. *See* Dkt. 1.  Pietrangelo claims (1) The Wing denied him a public accommodation based on his sex or gender identity in violation of D.C. Code §§ 2-1402.31(a)(1), (b), 2-1402.01; (2) The Wing engaged in discriminatory advertising in violation of D.C. Code § 1402.31(a)(2); (3) The Wing aided and abetted a violation of the DCHRA in violation of D.C. Code §§ 2-1402.01, 2-1402.61; and (4) The Wing's admissions policy disproportionately harmed men in violation of the Effects Clause of D.C. Code § 2-1402.68.  *See* Compl. ¶¶ 32–58.[4]  He seeks compensatory damages, punitive damages, and injunctive and declaratory relief.  *See id.* at 30.

As The Wing acknowledges, at the time of Pietrangelo's application, The Wing "did not have a formal, written membership policy and its practice was to admit as members only women and non-binary individuals."  Defs.' Counter-Statement of Material Facts ¶ 10.  But on August 30,

---

party . . . fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion [for summary judgment].");  Local Rule 7(h)(1) (permitting the Court to "assume the facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion").

[4] The complaint raises three claims, but on summary judgment, the parties construe Pietrangelo's complaint as raising four sets of claims.  *See* Defs.' Mem. in Opp'n at 5 & n.2, 13–14; Pl.'s Mem. in Opp'n to Defs.' Cross-Motion for Summ. J. at 9, 31, 32, 42 (Pl.'s Second Reply), Dkt. 131.  Following principles of party presentation, the Court will address the claims as presented by the parties.  *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[I]n both civil and criminal cases, in the first instance and on appeal, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

2018, approximately ten days after Pietrangelo filed suit, The Wing adopted a "formal, written membership policy . . . provid[ing] that all applicants will be evaluated based on their commitment to The Wing's mission, regardless of their perceived gender or gender identity." *Id.* ¶¶ 11–12.

On September 26, 2018, The Wing moved to dismiss Pietrangelo's complaint under Rule 12(b)(1), *see* Dkt. 11, and on June 4, 2019, this Court denied the motion, *see* Dkts. 23, 24.  The Wing's Washington, D.C. location subsequently closed in March 2020, and The Wing itself "ceased all business operations effective August 30, 2022." Defs.' Counter-Statement of Material Facts ¶¶ 16–17.  Now, at the summary judgment stage, Pietrangelo moves for partial summary judgment on his public-accommodation and advertising claims and punitive damages. Pl.'s Mot. for Partial Sum. J. at 1, Dkt. 127.  The Wing cross-moved for summary judgment on all of Pietrangelo's claims and the issue of punitive damages.[5]  *See* Defs.' Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of Defs.' Cross Mot. for Summ. J. at 15 (Defs.' Mem. in Opp'n), Dkt. 128-1.

## II.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" if a reasonable jury could

---

[5] Pietrangelo argues that the "Court should strike Defendants' Cross-Motion altogether" because "Defendants' singular Memorandum thereto is hopelessly intertwined with motion- and opposition-arguments."  Pl.'s Second Reply at 6.  This contention lacks any legal basis.  The Wing is permitted to oppose Pietrangelo's motion for summary judgment and to cross-move for summary judgment.  Given the obvious overlap in legal and factual issues, The Wing, quite reasonably and without offending the Local Rules, filed a unified brief.  Pietrangelo too could have filed a unified reply brief instead of separate (and repetitive) 43-page and 24-page reply briefs.  *See* Mem. in Reply to Defs.' Opp'n to Pl.'s Mot. for (Partial) Summ. J. (Pl.'s First Reply), Dkt. 130; Pl.'s Second Reply.

determine that the evidence warrants a verdict for the nonmoving party.  *See Anderson*, 477 U.S. at 248.  In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).  "When both parties move for summary judgment," as is the case here, "the court shifts the beneficiary of the factual inferences.  Once it determines that one party is not entitled to summary judgment, it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent."  *Cato Inst. v. FBI*, 638 F. Supp. 3d 13, 18 (D.D.C. 2022) (cleaned up).

It is well established, however, that a party opposing summary judgment must "substantiate [her allegations] with evidence" that "a reasonable jury could credit in support of each essential element of her claims."  *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015).  The moving party is entitled to summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   ANALYSIS

Pietrangelo brings four sets of DCHRA claims against The Wing: (1) a claim for the denial of a public accommodation under D.C. Code §§ 2-1402.31(a)(1), (b), 2-1402.01; (2) an advertising claim under D.C. Code § 1402.31(a)(2); (3) an aiding-and-abetting claim under D.C. Code §§ 2-1402.01, 2-1402.61; and (4) an Effects Clause claim under D.C. Code § 2-1402.68.  He seeks compensatory damages, punitive damages, and injunctive and declaratory relief.

### A.   DCHRA Claims

Pietrangelo moves for summary judgment on his public-accommodation and advertising claims, and The Wing cross-moves for summary judgment on all four DCHRA claims.  The Court

will grant Pietrangelo summary judgment on the public-accommodation and advertising claim, grant The Wing summary judgment as to the aiding-and-abetting claim, and deny The Wing summary judgment as to the Effects Clause claim.

        1.    *Public-Accommodation Claim*[6]

Under the DCHRA, "[i]t shall be an unlawful discriminatory practice . . . [t]o deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" based "wholly or partially" on any individual's "actual or perceived . . . sex" or "gender identity or expression." D.C. Code § 2-1402.31(a)(1); *see id.* § 2-1402.31(b) ("It is further unlawful to do any of the above said acts for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason based on the actual or perceived . . . sex . . . gender identity or expression . . . of any individual.").   A denial-of-public-accommodation claim under § 2-1402.31(a)(1) thus requires proof that the defendant (1) is a "place of public accommodations"; (2) denied the plaintiff "goods, services, facilities, privileges, advantages, [or] accommodations"; and (3) acted "wholly or partially for a discriminatory reason based on" a protected characteristic. *Cf. Sumes v. Andres*, 938 F. Supp. 9, 12 (D.D.C. 1996) (interpreting a predecessor provision of § 2-1402.31(a)(1)).

The parties agree that The Wing is a "place of public accommodations" within the meaning of the DCHRA, *see* Pl.'s Mot. for Partial Summ. J. at 5–7; Defs.' Mem. in Opp'n at 7, and that Pietrangelo was not given the "privileges, advantages, [or] accommodations" of membership in

---

[6] The Wing argues that Pietrangelo's claim under D.C. Code § 2-1402.01 is "merely duplicative" of his public-accommodation claim under § 2-1402.31(a)(1).  Defs.' Mem. in Opp'n at 13. Pietrangelo does not dispute that the claims are duplicative, *see* Pl.'s Second Reply at 42, so the Court will construe them as such.

The Wing, *see* Pl.'s Statement of Material Facts ¶ 15; Defs.' Resp. to Pl.'s Statement ¶ 15 (acknowledging Pietrangelo "was not admitted" but disputing "the reason" why).[7]  So what remains for the Court to resolve is whether The Wing denied Pietrangelo's application "wholly or partially" based on his "sex" and/or "gender identity or expression" based on the undisputed evidence.

The D.C. Court of Appeals generally interprets the DCHRA in parallel with Title VII of the Civil Rights Act of 1964.  *See, e.g.*, *Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886–87 (D.C. 2008).  A discrimination claim under the DCHRA may be proved either by direct or indirect evidence.  Direct "evidence includes any statement or written document showing a discriminatory motive *on its face*. . . . [D]irect evidence is a smoking gun showing that the decisionmaker *relied upon* a protected characteristic" in acting.  *Sims v. District of Columbia*, 33 F. Supp. 3d 1, 9 (D.D.C. 2014) (cleaned up).  When plaintiffs offer only indirect evidence of discrimination at summary judgment, their claims are evaluated under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See E.M. v. Shady Grove Reproductive Sci. Ctr. P.C.*, 496 F. Supp. 3d 338 (D.D.C. 2020).

---

[7] The Wing suggests that Pietrangelo was never denied admission to The Wing, but as Pollard told Pietrangelo, The Wing "never reject[ed] applications" but just "wait-list[ed]" them.  Pl.'s Mem. in Opp'n to Defs.' Mot. to Compel at 19.  This is a distinction without a difference. Pietrangelo was never granted membership, whether by outright rejection or permanent waitlist. *Cf. Lester v. Parker*, 237 F.2d 698, 699 (9th Cir. 1956) ("[T]he only difference between denying [the plaintiff's] right permanently, and denying it for a period of time, is one of degree. A temporary wrongful denial of employment is an act of the same character and quality as a permanent denial.").

i.      Direct Evidence[8]

Pietrangelo offers "direct evidence" that The Wing denied his application because of his "sex" and/or "gender identity/expression."   D.C. Code § 2-1402.31(a).   Direct evidence of discrimination includes "a statement that itself shows [unlawful] bias in the [relevant] decision." *Nurridin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016).   Specifically, Pietrangelo provides evidence that at the time of his application, The Wing enforced a policy of admitting only women and nonbinary applicants.   Pietrangelo first points to the transcript of his taped June 5, 2018 telephone call with Bee Pollard, a Community Associate at The Wing DC, the day after he submitted his application.   On the call, Pietrangelo announced "[o]bviously, I'm a man, and I applied for membership," and he then asked if "the policy [is] that men are not permitted to be members."  Pl.'s Mem. in Opp'n to Defs.' Mot. to Compel at 19.   Pollard responded, "Right.  So it's just the self-identifying women" and "non-binary individuals."  *Id.*  Pietrangelo clarified if he "never [would] be accepted or granted" membership, and Pollard answered in the affirmative, noting "the first thing we do is we just wait-list [the application] . . . we never reject applications." *Id.*   Pollard again clarified that only "[s]elf-identifying women" may be admitted.  *Id.*   Her statements were no "stray remark[s]"; rather, she told Pietrangelo that because of a protected characteristic—*i.e.*, his sex and/or gender—he would not be admitted for membership.  *Coats v. DeVos*, 232 F. Supp. 3d 81, 87–88 (D.D.C. 2017) (cleaned up).

---

[8] The Wing assumes that Pietrangelo points to, at best, indirect evidence of discrimination, *see* Defs.' Reply in Further Supp. of Cross-Mot. for Summ. J. at 7–8 (Defs.' Reply), Dkt. 132, and Pietrangelo is unclear whether the evidence is direct or indirect, *see* Pl.'s Mot. for Summ. J. at 5–16.  Given Pietrangelo's *pro se* status, the Court believes this is a "circumstance[] in which a modest initiating role" is necessary to ensure this Circuit's DCHRA and Title VII precedents are properly applied.  *Sineneng-Smith*, 140 S. Ct. at 1579.

The Wing argues that Pollard's statements are immaterial because "there is no evidence that [Pollard] played any role in reviewing [Pietrangelo's] application for membership." Defs.' Mem. in Opp'n at 7 n.3. But no reasonable juror could credit this argument given the record. Indeed, the alleged decisionmakers on Pietrangelo's application shared Pollard's understanding. Helen Dally, who "reviewed [Pietrangelo's] application," Defs.' Counter-Statement of Material Facts ¶ 14, testified that she "was aware . . . it was the practice of The Wing to accept as members women and non-binary individuals" and acknowledged that this policy excluded "cisgender men," like Pietrangelo, Helen Dally Dep. 41:1–8. Moreover, The Wing's leadership team echoed Pollard and Dally. Former CEO Audrey Gelman stated that "[p]rior to August 30, 2018" The Wing's "practice was to admit as members *only* women and non-binary individuals." Defs.' Counter-Statement of Material Facts ¶ 10 (emphasis added); *see* Decl. of Audrey Gelman ¶ 6, Dkt. 11-3. Indeed, she said as much publicly. After the New York City Commission on Human Rights opened an investigation into The Wing for alleged sex discrimination, Gelman tweeted that the investigation has "only gotten [The Wing] more press" and The Wing is "gonna be O.K.: (Without men.)." Pl.'s Statement of Material Facts ¶ 59.[9] In addition, former CFO Diedra Nelson testified, like Gelman, that "[p]rior to September 2018, our practice was to accept women and nonbinary folks." Diedra Nelson Dep. 195:15–16.

Viewing these statements in the light most favorable to Pietrangelo, as the Court must do in assessing The Wing's cross-motion for summary judgment, *see Hampton v. Vilsack*, 685 F.3d

---

[9] The Wing disputes this statement as unauthenticated hearsay. *See* Defs.' Resp. to Pl.'s Statement ¶ 59. For the reasons described in Section III.A.2.i, *infra*, the Court finds this objection baseless. Pietrangelo provides sufficient extrinsic evidence authenticating Gelman's tweet. The statement is also "not hearsay" because it is a statement offered against The Wing "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D).

1096, 1099 (D.C. Cir. 2012), the statements evince The Wing's preference for women and non-binary individuals over cisgender men like Pietrangelo.  And Pollard's statement further illustrates that this policy applied to Pietrangelo's application, which was waitlisted shortly after their phone conversation.  *See Coats*, 232 F. Supp. 3d at 87 (finding direct evidence of discrimination when a supervisor told a plaintiff he was being removed "because of your race and salary").  Direct evidence that a defendant denied a public accommodation based on a protected characteristic like "sex" or "gender identity or expression" under the DCHRA is "generally" sufficient on its own to "entitle a plaintiff to a jury trial."  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam).  The Court will thus deny The Wing's cross-motion for summary judgment on the public-accommodation claim.

What's more, the Court concludes that "[t]his is that rare case in which a plaintiff wins on summary judgment."  *Norden v. Samper*, 503 F. Supp. 2d 130, 137 (D.D.C. 2007).  Summary judgment for Pietrangelo would be inappropriate if there remains any genuine dispute as to whether The Wing "wholly or partially" denied his admission based on "sex" or "gender identity or expression."  D.C. Code § 2-1402.31(a).  Despite undisputed evidence that a sex- and gender-based admissions policy was in force at the time Pietrangelo's application was waitlisted, The Wing offers several reasons why the denial of the application was not "wholly or partially" based on his "sex" and/or "gender identity or expression."  All are unavailing.

First, The Wing argues that "prior to [its] dissolution, men could and did become members," putting into dispute whether The Wing's admission policy excluded men.  Defs.' Mem. in Opp'n at 7 (citing Defs.' Counter-Statement of Material Facts ¶ 3).  The Wing "did not ask applicants to identify their gender," Defs.' Counter-Statement of Material Facts ¶ 2, and The Wing contends there was at least one male member, *see* Diedra Nelson Dep. 161:5–10.  But the record

suggests otherwise.  The Wing's only evidence that "men could be members" is Diedra Nelson's testimony that she knew of a man who was granted membership.  Defs.' Counter-Statement of Material Facts ¶ 3 (citing Diedra Nelson Dep. at 142:18–22).  The Wing mischaracterizes her deposition, however.  *See Lewis v. Booz-Allen Hamilton, Inc.*, 150 F. Supp. 2d 81, 84 (D.D.C. 2001) ("[S]ummary judgment requires an examination of the *entire record*, including all pleadings and all admissible evidence." (emphasis added)).  In particular, after Nelson stated there was "a male member of The Wing" at its West Hollywood location, upon further questioning from Pietrangelo, she admitted that she did not know the member's name and that the member identified as "nonbinary," not male.  *See* Diedra Nelson Dep. 162:3–4.  Nelson's statement thus supports, rather than refutes, Pollard's, Dally's, and Gelman's testimony that The Wing favored female and nonbinary applicants over male applicants.

Second, The Wing argues that Pietrangelo "was not admitted to The Wing because of his insufficient responses on his application for membership," not because of his sex or gender.  Defs.' Mem. in Opp'n at 9.  Even if the Court assumes Pietrangelo's application fell short of The Wing's standards, The Wing points to no evidence that his application was denied on that basis.  The Wing again invokes the testimony of Nelson.  *See* Defs.' Resp. to Pl.'s Statement ¶ 11 (citing Diedra Nelson Dep. at 194:23–195:12, 195:19–25, 197:12–18).  She testified that Pietrangelo's application did "not exhibit that [Pietrangelo] ha[s] a commitment to our mission," but Nelson's testimony never indicates that she was involved in the decision to waitlist Pietrangelo on or around June 5, 2018.  Diedra Nelson Dep. at 197:14–17.  Although The Wing is not required to "publish a contemporaneous statement of reasons every time" it denies an application, *Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007), Nelson was a "non-decision-maker[]" and remained "unrelated to the decisional process" on Pietrangelo's application, *Brady v. Livingood*, 456 F.

12

Supp. 2d 1, 6 (D.D.C. 2006).  So her testimony, which amounts to post hoc rationalization, is immaterial.

Further, the testimony of Helen Dally, the person who actually "reviewed Plaintiff's application" according to The Wing, undermines The Wing's position.  Defs.' Counter-Statement of Material Facts ¶ 14.  As Dally testified, she first learned about Pietrangelo's application "immediately after" his phone call with Pollard on June 5, 2018.  Dally Dep. at 13:13.  Dally "called [her] boss" Marianna Martinelli "to ask what they would like us to do" and "what next steps" should be taken on Pietrangelo's application.  *Id.* at 16:12–14.  Martinelli informed Dally that she would "consult with her boss" Audrey Gelman.  *Id.* at 18:12–13, 16–17.  "[L]ater that day or a few days" later, Martinelli (or Dally's other supervisor Frenchie Ferenczi) "instructed" Dally to "wait list" the application.[10]  *Id.* at 20:6–7, 18.  Dally was given no further information about Pietrangelo's application and testified that she did "know . . . why the decision was made to have [Pietrangelo's] application placed on the waitlist."  *See id.* at 48:5–7.  The Wing downplays Dally's February 11, 2022 deposition because it occurred "nearly three years after Plaintiff's application was submitted" and instead directs the Court's attention to "very specific information about Ms. Dally's review" in The Wing's October 28, 2019 interrogatory responses.  Defs.' Reply at 4.  But these interrogatories merely state that Dally "reviewed Plaintiff's application . . . including each of his answers" on June 5, 2018 and that she "generally," though not specifically in Pietrangelo's case, would "decide if the applicant was 'Wing Material' or should be put on a waitlist."  Defs.' Mem. in Opp'n Ex. F at 5, 7–8, Dkt. 128-9 (Defs.' Resps. & Objs. to Pl.'s First Set of Interrogs.).

---

[10] The Wing does not point to any testimony from Martinelli or Ferenczi about the reason Pietrangelo was placed on the waitlist.  To the Court's knowledge, the only docketed testimony from Martinelli is a declaration used to append Pietrangelo's application.  *See* Decl. of Marianna Martinelli ¶ 6, Dkt. 15-1.

The interrogatories all but confirm Dally's sworn testimony that she was not the ultimate decisionmaker nor was she privy as to why Pietrangelo was not admitted. The Wing has insisted throughout this litigation that Pietrangelo was not admitted because of his inadequate application answers, but The Wing has failed to offer sworn testimony to that effect from an actual decisionmaker.

Third, The Wing relies on *E.M. v. Shady Grove Reproductive Science Center P.C.*, 496 F. Supp. 3d 338 (D.D.C. 2020), but this case is inapposite. The plaintiff in *E.M.* brought several DCHRA claims against a physician, alleging discrimination based on several protected characteristics including "marital status." *Id.* at 373–74. The plaintiff moved for summary judgment on her marital-status-discrimination claim, primarily relying on a telephone transcript in which her physician acknowledged that the plaintiff was unmarried. *See id.* at 375. The Court held that this evidence was insufficient to grant the plaintiff summary judgment because it failed to show the defendant's "policies [were] only being applied because [the plaintiff] is unmarried"; rather, the physician's statements (construed in the light most favorable to the defendant) reflected his observation that "the situation would be very different," *i.e.*, the law would treat the plaintiff's partner differently depending on whether he was classified as "a sperm donor" or her "husband." *Id.* at 375–76.

*E.M.* is distinguishable from Pietrangelo's case. To start, the plaintiff in *E.M.* relied on a doctor's statement that was amenable to a benign reading—*i.e.*, the plaintiff would receive different treatment based on the legal classification of her partner. By contrast, Pietrangelo here offers direct evidence of discrimination: namely, testimony from numerous employees of The Wing acknowledging that as of June 5, 2018 The Wing did not admit men. *See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Compel at 19 (noting an affirmative response to Pietrangelo's question

whether he "would never, ever be admitted, because it's a women-only membership" because The Wing is for "[s]elf-identifying women"). And unlike *E.M.*, Pietrangelo does not rely on "distorted readings" of The Wing's "employees' testimony and [his] own self-serving assertions." *E.M.*, 496 F. Supp. 3d at 381. The above-quoted testimony from The Wing's employees speaks for itself.

Construing all the evidence in The Wing's favor, the Court concludes that The Wing has not "show[n] that sufficient evidence exists for a reasonable jury to find in [its] favor with respect to the element[s] essential to" Pietrangelo's public-accommodation claim. *Coats*, 232 F. Supp. 3d at 86–87 (cleaned up). In contrast, Pietrangelo has presented sufficient undisputed evidence for the Court to conclude as a matter of law that The Wing did not admit him based, at least in part, on his sex or gender. Thus, the Court will grant Pietrangelo's motion for summary judgment on his public-accommodation claim.

### ii.    Indirect Evidence

Even if the undisputed evidence constituted no more than indirect evidence of discrimination, the Court would reach the same conclusion. In cases involving indirect evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp.*, 411 U.S. at 802–03. Under that framework, the employee "must first make out a prima facie case" of discrimination. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). The burden then shifts to the employer to "come forward with a legitimate reason for the challenged action." *Id.* If the employer proffers a legitimate nondiscriminatory reason, the burden then shifts back to the employee to show that the stated reason is pretextual. *See id.* In this Circuit, it is well established that if the employer provides a legitimate nondiscriminatory reason, the district court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

Here, The Wing asserts that Pietrangelo was not admitted because of his insufficient application answers.  So the Court must evaluate whether Pietrangelo "has . . . produced sufficient evidence for a reasonable jury to find that [The Wing's] asserted non-discriminatory reason was not the actual reason and that [The Wing] intentionally discriminated against [him] on the basis of . . . sex" or gender identity.  *Brady*, 520 F.3d at 494.

Any reasonable juror would find that Pietrangelo has met this burden.  First, a reasonable juror would infer pretext from The Wing's shifting explanations as to why Pietrangelo was not admitted.  In the employment context, pretext can be shown through "changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker."  *Id.* at 495 n.3.  Pollard's statement on June 5, 2018 that Pietrangelo's application would be "wait-list[ed]" because The Wing accepts only "self-identifying women" and "non-binary individuals," Pl.'s Mem. in Opp'n to Defs.' Mot. to Compel at 19, is inconsistent with Nelson's September 11, 2019 testimony that Pietrangelo's application was not accepted because it failed to "provide specific examples of how [Pietrangelo] ha[s] supported the advancement of women," among other insufficiencies, Diedra Nelson Dep. at 195:6–8.  The differences between Pollard's and Nelson's explanations are not "fine descriptive differences between materially consistent accounts"; rather, The Wing simply changed its explanation between 2018 and 2019 (and only after this litigation started).  *Walker v. Johnson*, 798 F.3d 1085, 1094 (D.C. Cir. 2015).  "Such shifting and inconsistent justifications are probative of pretext."  *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (cleaned up).  Nelson's explanation is further undermined by The Wing's own admission that some number of women and nonbinary individuals received complimentary membership and were required to fill out an application as a mere formality.  *See* Helen Dally Dep.

at 51:19–52:16; Defs.' Resp. to Pl.'s Statement ¶ 22; *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (noting the "heavy use of highly subjective criteria . . . could support an inference of discrimination" (cleaned up)).

Second, The Wing's "failure to follow its own procedures" in reviewing Pietrangelo's application is "probative evidence of pretext." *Johnson v. District of Columbia*, 99 F. Supp. 3d 100, 106 (D.D.C. 2015). Nelson testified "a small team . . . reviews all" applications, and each application is reviewed "to determine if you as an applicant are committed to our mission." Diedra Nelson Dep. at 157:17–19, 179:18–19. The decision to admit an application was "within the reviewer's discretion," and the specific reviewers were randomly assigned. *Id.* at 182:18–19, 183:7–8. But Dally's testimony strongly suggests that The Wing did not follow these procedures for Pietrangelo. After Pietrangelo's call with Pollard, Dally briefed her supervisor Martinelli, who was in New York, and at some later point, Martinelli or Ferenczi "instructed" Dally to "place[] [the application] on the wait list" without any further explanation. Dally Dep. at 20:15–18, 21:4–8. Despite being the "reviewer," Dally did "not know . . . why the decision [was] made to have [the] application placed on the waitlist," *id.* at 48:5–7, and she lacked familiarity with the process of marking an application as "demonstrat[ing] little to no commitment to The Wing's core values" on the application portal. *Id.* at 67:8–15.

Third, The Wing's internal communications, which were disclosed during discovery, require an inference of discrimination. Before August 30, 2018, The Wing's "practice" was "to admit as members only women and non-binary individuals." Defs.' Counter-Statement of Material Facts ¶ 10. On August 30, 2018, however, The Wing's Board of Directors "approved the adoption [of] The Wing's first formal, written membership policy," which "provide[d] that all applicants will be evaluated based on their commitment to The Wing's mission, regardless of their perceived

gender or gender identity." Defs.' Counter-Statement of Material Facts ¶¶ 11–12. But Pietrangelo points to an internal memorandum titled "Membership Policies FAQs & Talking Points" that The Wing circulated to assist managers with fielding questions about the policy change. *See* Pl.'s Mot. for Sanctions Ex. 4 at 1, Dkt. 101-4. If asked "Why did the Wing do this?" managers were encouraged to respond that "[w]ith a growing number of members who identify as transgender or beyond the gender binary, [The Wing] want[s] to make sure that we are as inclusive a community as possible . . . including women and people of marginalized genders." *Id.* at 2. If a member wondered why she is "seeing 'straight up men'" at The Wing, managers were encouraged to say that The Wing "is welcoming and committed to all marginalized genders." *Id.* If a member expressed displeasure because they "liked this place better when it was women-only" or "[t]here's a lot of guys in the space" now, managers were encouraged to "ask that members keep in mind that The Wing is a space designed for women with a women's-focused mission." *Id.* at 3.

These communications reflect a disparity between The Wing's internal and external messaging, permitting and indeed requiring an inference of pretext. On one hand, The Wing adopted a membership policy that provided the appearance of sex and gender neutrality. On the other hand, The Wing internally messaged that the adoption of its new policy was an effort to expand membership to "marginalized genders," a reference to transgender women and nonbinary individuals, not cisgender men. *Id.* at 2.

Although the facts of this case may be unusual, the underlying principles are not. The Wing held itself out as a social space for women and nonbinary individuals; it admitted no men; and when a man did apply, his application was denied through an extraordinary and atypical process. That is a paradigmatic case of discrimination. Even viewing the evidence in the light most favorable to The Wing, a reasonable juror could not find that The Wing's proffered reason

for waitlisting Pietrangelo was either legitimate or nondiscriminatory.  Therefore, even under the

*McDonnell Douglas* framework for indirect evidence, the Court would deny The Wing's cross-

motion and grant Pietrangelo's motion for summary judgment.

> ### 2.     *Advertising Claims*

Under the DCHRA, it is "an unlawful discriminatory practice" for a public

accommodation, based on "sex" or "gender identity or expression," to:

> print, circulate, post, or mail, or otherwise cause, directly or indirectly, to be
> published a statement, advertisement, or sign which indicates that the full and equal
> enjoyment of the goods, services, facilities, privileges, advantages, and
> accommodations of a place of public accommodation will be unlawfully refused,
> withheld from or denied an individual; or that an individual's patronage of, or
> presence at, a place of public accommodation is objectionable, unwelcome,
> unacceptable, or undesirable.

D.C. Code § 2-1402.31(a)(2).   A claim under this provision thus requires proof that (1) the

defendant operates as "a place of public accommodation"; (2) the defendant acted "[t]o print,

circulate, post, or mail, or otherwise cause, directly or indirectly" the publication of "a statement,

advertisement, or sign"; and (3) the publication "indicate[d]" either that (a) the defendant's "goods,

services, facilities, privileges, advantages, and accommodations" would be "unlawfully refused,

withheld from or denied [to] an individual" or (b) "an individual's patronage of, or presence at, a

place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable."  *Id.*

Pietrangelo argues that The Wing violated D.C. Code § 2-1402.31(a)(2) by "market[ing]

itself as a women's only space" "via marketing materials, press, and its application process on its

website."   Mot. for Summ. J. at 16.   He points to The Wing's advertisements, merchandise,

magazine, interviews with the press, and podcast using the phrase "No Man's Land" and to The

Wing hosting an "annual summer-retreat called 'Camp No Man's Land.'"  *Id.* at 17; *see also* Pl.'s

Statement of Material Facts ¶¶ 32–36, 38–39.  Also, on its social-media accounts, The Wing shared

news accounts characterizing it as "a place designed for women with a women's focused mission."

19

Mot. for Summ. J. at 26; *see also* Pl.'s Statement of Material Facts ¶ 42 (excerpting statements from The Wing's Twitter account characterizing it as a "women-only co-working space").   In response, The Wing argues that Pietrangelo "fails to cite any admissible evidence or material in the record" supporting his advertising claim because he relies on newspaper articles, "social media posts[,] and marketing statements" that are "inadmissible hearsay."  Defs.' Mem. in Opp'n at 12. Further, "the social media posts that Plaintiff relies upon in an effort to prove his [advertising] claim have not been authenticated by the alleged authors of any such posts."  *Id.* at 13.  Even if the statements are admissible, The Wing contends that "'No Man's Land' was merely a facetious title."  Defs.' Resp. to Pl.'s Statement ¶ 32.  Both parties move for summary judgment.

i.   Evidentiary Objections

The Court begins with The Wing's evidentiary objections.  Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, "[a] party" opposing summary judgment "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  "To survive summary judgment the non-moving party must produce evidence . . . capable of being converted into admissible evidence," and "sheer hearsay . . . counts for nothing on summary judgment."  *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (cleaned up).  Similarly, "[u]nsworn, unauthenticated documents cannot be considered on a motion for summary judgment."  *Akers v. Liberty Mut. Grp.*, 744 F. Supp. 2d 92, 97 (D.D.C. 2010) (cleaned up).

First, The Wing argues that Pietrangelo relies on inadmissible hearsay, but this argument is largely incorrect.  Hearsay is "a statement that . . . the declarant does not make while testifying at the current trial or hearing[] and . . . a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  "Hearsay is not admissible unless" permitted by

20

"a federal statute," the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court." *Id.* 802.

As to statements made on The Wing's "public website, social media, and advertising" including the phrase "No Man's Land," Pl.'s Statement of Material Facts ¶ 39, The Wing argues that the statements are "inadmissible hearsay" because "the accuracy of social media posts is difficult to establish and far from reliable." Defs.' Memo in Opp'n at 12. But it is blackletter law that a "statement . . . offered against an opposing party" that "was made by the party in an individual or representative capacity" is "not hearsay." Fed. R. Evid. 801(d)(2)(A). The Wing does not dispute that, in print and online, it published numerous statements and advertisements that used the phrase "No Man's Land." *See* Pl.'s Statement of Material Facts ¶ 39; Defs.' Resp. to Pl's Statement ¶ 39. Indeed, Pietrangelo provides ample evidence that The Wing itself, through its official social-media accounts, published these "No Man's Land" statements. *See* James Pietrangelo Decl. 1 Attach. 4, 6–9, Dkt. 14-1. The statements are thus "not hearsay" under Rule 801(d)(2)(A).

As to the newspaper articles shared on The Wing's Twitter account, The Wing argues that "newspaper articles are considered hearsay." Defs.' Mem. in Opp'n at 12. "[C]ourts have routinely held that newspaper articles constitute inadmissible hearsay because they usually provide no evidence of the reporter's perception, memory, or sincerity." *Democracy Forward Found. v. Pompeo*, 474 F. Supp. 3d 138, 150 (D.D.C. 2020) (cleaned up); *see also Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1165 (D.C. Cir. 1995) ("We seriously question whether a New York Times article is admissible evidence of the truthfulness of its contents."). The Wing is correct in part, but it overlooks all the ways in which Pietrangelo relies on newspaper statements.

To the extent Pietrangelo seeks to admit newspaper articles reporting on The Wing, statements contained in those articles are inadmissible.  *See* Mot. for Summ. J. at 21–23, Pietrangelo does not point to any established hearsay exception, and his perfunctory citations to Rule 807 are insufficient to satisfy the "extremely narrow" residual hearsay exception, which "requires testimony to be very important and very reliable."  *United States v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017) (cleaned up); *see* Pl.'s Second Reply at 35–36.

Similarly, to the extent Pietrangelo seeks to admit statements from newspaper articles containing quotes from employees of The Wing, *see* Mot. for Summ. J. at 24–25, the statements are still inadmissible.  "Hearsay within hearsay" is not admissible unless "each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.  Even though statements by employees of The Wing would be admissible as party-opponent employee or agent admissions under Rule 801(d)(2)(D), the statements are nested within newspaper articles, which are not subject to a hearsay exception for the reasons stated.

But these are not the only newspaper statements Pietrangelo seeks to admit.  Pietrangelo also seeks to admit The Wing's own "retweets" (i.e., reposts to its own account) of news-publication statements.  Under Rule 801(d)(2)(B), a statement is "not hearsay" if the "statement is offered against an opposing party" and "is one the party manifested that it adopted or believed to be true."  For a statement to be an adoptive admission, "the party or one of its agents must have understood and unambiguously assented to the statement."  *United States ex rel. Landis v. Tailwind Sports Corp.*, 292 F. Supp. 3d 211, 221 (D.D.C. 2017) (quoting *United States v. Beckham*, 968 F.2d 47, 52 (D.C. Cir. 1992)).  This "understanding and assent may be established through conduct [and] words," looking to the overall context.  *Id.* (quoting *Beckham*, 968 F.2d at 52).

The Wing retweeted various news publications' statements characterizing it as a "women's-only" organization.  For example, around September 4, 2018, The Wing retweeted a tweet from the "news-site TechCrunch" stating The Wing is a "[w]omen-only co-working space." Pl.'s Statement of Material Facts ¶ 42.  And on October 23, 2018, "there was viewable on The Wing's Twitter account-feed a re-tweet of a tweet from news-site The Cut referring to The Wing as 'the women's-only co-working space.'"  *Id.*  To be sure, whether a statement is an adoptive admission is a contextual inquiry, and not every "retweet" or "repost" is an adoptive statement.  A political journalist may retweet a politician's statement to promote awareness of the statement without "assent[ing] to [the] statement" itself, *Landis*, 292 F. Supp. 3d at 221, or "believ[ing] it to be true," Fed. R. Evid. 801(d)(2)(B).  But in context, The Wing retweeted the news publications' statements to embrace and, in turn, promote their meaning.  The Wing capitalized on positive press as an up-and-coming "women-only" workspace and sought to share the statements from its account.  *See, e.g.*, James Pietrangelo Decl. in Supp. of Mot. for Leave to File Surreply Attach. 1 (James Pietrangelo Decl. 2), Dkt. 16-2 (retweeting CNBC's tweet "[t]he millennial pink coworking space for women, @the_wing, announced this week that it will launch an on-site children's space called 'The Little Wing' this winter" and responding "Yay thanks @CNBCMakeIT"); *id.* Attach. 2 (retweeting TicToc by Bloomberg's tweet "Starting in December, women's co-working space @the_wing is going to offer childcare for their members"); James Pietrangelo's Decl. 1 Attach. 15, Dkt. 14-1 (retweeting Women 2.0's tweet "Women-only co-working spaces are the newest rage in the #MeToo age . . . mentioning @the_wing").  The Wing thus "understood and unambiguously assented" to the news-publication tweets, and The Wing's "retweets" thus constitute admissible adoptive admissions.  *Landis*, 292 F. Supp. 3d at 221.

Second, The Wing argues that "the social media posts that [Pietrangelo] relies upon . . . have not been authenticated."  Defs.' Mem. in Opp'n at 13.  "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Civ. P. 901.  Although Rule 901 "does not erect a particularly high hurdle to evidence's admission," *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (cleaned up), "[a]uthentication of social media evidence . . . presents some special challenges," *United States v. Lamm*, 5 F.4th 942, 9447 (8th Cir. 2021) (cleaned up).  With "great ease" a "social media account may be falsified or a legitimate account may be accessed by an imposter."  *United States v. Browne*, 834 F.3d 403, 437 (3d Cir. 2016).  Courts of Appeals thus "consider a wide range of evidence for the authentication of social media records," including testimony of a person with knowledge and "personal information" linking the author to the document.  *Id.* at 437, 440.

As to screenshots of a webpage, courts have authenticated screenshots when a witness testifies that she "saw and printed the posting from the . . . website" as "long as the screenshots contain circumstantial indicia of authenticity."  *Pohl v. MH Sub I, LLC*, 332 F.R.D. 713, 717 (N.D. Fla. 2019); *see, e.g.*, *United States v. Gasperini*, 894 F.3d 482, 490 (2d Cir. 2018) (authenticating a screenshot taken from an internet archival tool when a witness testified about "the nature and reliability of the [archival tool's] procedures for capturing and cataloguing the contents of the internet at particular times"); *United States v. Farrad*, 895 F.3d 859, 879 (6th Cir. 2018) ("We see no reason to depart from the ordinary rule that photographs, including social-media photographs, are authenticated by evidence sufficient to support a finding that the photograph is what the proponent claims it is." (cleaned up)); *Foreword Mag., Inc. v. OverDrive, Inc.*, No. 10-cv-1144, 2011 WL 5169384, at *3 (W.D. Mich. Oct. 31, 2011) (same).  *But see United Health Prods. v.*

24

*Animal Health Int'l, Inc.*, No. 20-cv-788, 2021 WL 930682, at \*4 (S.D. Tex. Mar. 11, 2021) (holding that a screenshot did not clear the Rule 901 bar because the proponent of the screenshot "did not submit any testimony, such as an affidavit, to authenticate the screenshot"); *MSP Recovery Claims, Series LLC v. Am. Nat'l Prop. & Cas. Co.*, 550 F. Supp. 3d 1311, 1319 n. 9 (S.D. Fla. 2021) ("Courts have also held the date the website was accessed and the webpage URL address must be provided to authenticate a screenshot.").

Pietrangelo offers sufficient evidence to support a finding that the screenshots of The Wing's statements are what they purport to be. In a sworn declaration, Pietrangelo attests that he accessed The Wing's website, public Twitter, Facebook, and Instagram accounts, viewed the relevant social-media posts from October 3, 2018 to October 4, 2018 and on October 25, 2018, and captured screenshots on his Mac computer that "fairly and accurately depict[] the respective" content. James Pietrangelo Decl. 1 ¶¶ 18–19, Dkt. 14-1; James Pietrangelo's Decl. 2 ¶ 4, Dkt. 16-2; *see also* Pl.'s Second Reply to Opp'n at 37 (Pietrangelo "personally [went] to The Wing's website or respective social-media account and t[ook] a screenshot of the material thereon at the time."). Moreover, the screenshots contain "indicia of authenticity," *Pohl*, 332 F.R.D. at 717, including The Wing's official Instagram and Twitter account names, The Wing's official logo, and date stamps on each post corroborating Pietrangelo's declaration, *see* James Pietrangelo Decl. 2 Attach. 1–4, Dkt. 16-2.

At bottom, The Wing's arguments against authentication amount to little more than generalized concerns about the "accuracy of social media posts." Defs.' Mem. in Opp'n at 12–13. Although the authentication burden remains on Pietrangelo, The Wing does not point to any evidence that Pietrangelo fabricated or otherwise altered the statements contained in the screenshots. The Wing suggests "the alleged authors of any such posts" have not authenticated

Pietrangelo's screenshots, but "[t]estimony of the author is but one way to authenticate documents; circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1283 (D.C. Cir. 1981) (citing McCormick on Evidence § 222 (2d ed. 1972)). Given Pietrangelo's declaration, various indicia of authenticity, and the lack of evidence of alteration, the Court deems the screenshot statements properly authenticated.

ii.      Merits

Having overruled The Wing's evidentiary objections, the Court must examine whether Pietrangelo has demonstrated that there are "no genuine dispute[s] as to any material fact and [he] is entitled to judgment as a matter of law" on his advertising claim.   Fed. R. Civ. P. 56(a). Pietrangelo's advertising claim relies on The Wing's use of the catchphrase "No Man's Land" in its advertising, publications, merchandising, and public statements, *see* Pl.'s Statement of Material Facts ¶ 39, and The Wing's adoptive statements that it is a "women's-only coworking space," *see id.*¶ 42; James Pietrangelo Decl. 1 Attach. 9, Dkt. 14-1; James Pietrangelo Decl. 2 Attach. 1–4, Dkt. 16-2.  The Court must view this evidence "in the light most favorable to" The Wing and "must draw all reasonable inference in favor of" The Wing.   *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).  The Wing does not dispute its use of the phrase "No Man's Land," but instead suggests the statements were merely "facetious" and tongue in cheek. Defs.' Resp. to Pl.'s Statement ¶¶ 32, 39.  But reading The Wing's repeated publication of the "No Man's Land" trope in its advertising and publications, a reasonable juror would draw the only plausible inference: men's "patronage of, or presence at" The Wing was "objectional, unwelcome, unacceptable, or undesirable."  D.C. Code § 2-1402.31(a)(2).

Even assuming "No Man's Land" was a harmless quip and not an overt statement of exclusion, The Wing cannot escape its numerous adoptive statements advertising its facilities as a

women's-only workspace. The Wing perfunctorily denies the validity of these statements, *see* Defs.' Resp. to Pl.'s Statement ¶ 42 ("Defendants deny the unauthenticated hearsay statements."), but a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). A party denying a fact may not, however, rest on mere allegations or the denial itself. The Wing has not met this burden, so the Court deems the adoptive statements as sufficient to show The Wing advertised that men's presence in its facilities was "objectional, unwelcome, unacceptable, or undesirable." D.C. Code § 2-1402.31(a)(2). The Court will thus grant Pietrangelo's motion for summary judgment and deny The Wing's cross-motion.

### 3. *Aiding-and-Abetting Claims*

Under D.C. Code § 2-1402.62, "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so." The DCHRA's "aiding and abetting clause 'is meant to prohibit an individual *from assisting another* person in discriminating,' and thus, the actors who performed the discriminatory acts cannot also aid and abet the alleged discrimination." *Gatling v. Jubilee Hous., Inc.*, No. 20-cr-3770, 2022 WL 227070, at *6 (D.D.C. Jan. 26, 2022) (emphasis added) (quoting *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 156 (D.D.C. 2014)).

The Wing argues that Pietrangelo's aiding-and-abetting claim "is completely unsupported by any facts in the record." Defs.' Mem. in Opp'n at 14. In reply, Pietrangelo briefly argues that "evidence of aiding and abetting inheres in The Wing's posting third-party discriminatory statements on its social-media accounts." Pl.'s Second Reply at 42. But Pietrangelo points to no evidence that third parties "performed . . . discriminatory acts" nor that The Wing assisted in the

completion of such acts.  *Gatling*, 2022 WL 227070, at \*6.  Indeed, Pietrangelo is unclear as to

who exactly these "third parties" are—whether they are social-media websites hosting The Wing's

statements or news-media organizations publishing The Wing's statements.   Absent any

allegations about third-party conduct, Pietrangelo's allegations of discrimination relate to "the

same acts that [The Wing] allegedly committed in violation" of the DCHRA's substantive

provisions.  *Id.*  The Court will thus grant The Wing summary judgment on this claim.

### 4.     *Effects Clause Claims*

Under the DCHRA's Effects Clause, "Any practice which has the effect or consequences

of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory

practice."  D.C. Code § 2-1402.68.  The Effects Clause provides that "despite the absence of any

intention to discriminate, practices are unlawful if they bear disproportionately on a protected class

and are not independently justified for some nondiscriminatory reason."   *Gay Rts. Coal. of

Georgetown Univ. L. Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987).  This provision

imports "the concept of disparate impact discrimination developed by the Supreme Court in *Griggs

v. Duke Power Co.*, 401 U.S. 424 (1971)."  *Id.*  An Effects Clause claim is subject to a two-part

test.  First, a plaintiff must make "a prima facie case of disparate impact," which "requires the

identification of a specific . . . practice that, while facially neutral, nonetheless had a

disproportionate adverse effect on a protected class of *individuals*."  *McCaskill*, 36 F. Supp. 3d at

157.  A prima facie case "requires a demonstration of causation through statistical evidence of a

kind and degree sufficient to show that the practice in question . . . caused individuals to suffer the

offending adverse impact because of their membership in a protected group."  *Id.* (cleaned up).

Second, if a plaintiff has made out a prima facie case, the burden shifts to the defendant, and the

"defendant may protect against such a disparate-impact claim by showing that her decision was

justified by a neutral, nondiscriminatory reason, as outlined in *Griggs*."  *Smith v. Henderson*, 982 F. Supp. 2d 32, 52 (D.D.C. 2013).  The DCHRA enumerates several exemptions, including an exemption for "business necessity."  D.C. Code § 1-2503(a).

First, viewing the evidence in the light most favorable to Pietrangelo, he has made out a prima facie case under the Effects Clause.[11]  At the prima facie stage, a plaintiff must "provide statistical evidence of a disparate impact" on "members of the protected class. . . . And without such evidence, the Court cannot say that the Plaintiffs have carried their threshold burden based on submission of statistical evidence."  *Borum*, 2020 WL 1508906, at *8.  As the Supreme Court indicated in the employment context, "statistical disparities must be sufficiently substantial that they raise such an inference of causation."  *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 995 (1988).  A plaintiff may "demonstrate causation by presenting evidence that the disparity in outcomes . . . is 'statistically significant,' meaning that statistical analysis reflects that the odds of the disparity occurring by mere coincidence are less than 5%."  *Abdul-Baaqiy v. Fed. Nat'l Mortg. Ass'n*, No. 15-cv-450, 2018 WL 4637002, at *7 (D.D.C. Sept. 27, 2018).  For example, in *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 48 (D.D.C. 2003), plaintiffs presented evidence that a taxi company's "pickup rate for all portions of [Washington, D.C.] other than Anacostia was 2.6 times larger than the pickup rate for Anacostia and that the number of standard deviations representing the difference is 21.6."  *Id.*  Also, the evidence reflected that the defendant's "business practice of picking up passengers from Anacostia at a lower rate than it does from the rest of the District b[ore]

---

[11] The Court notes that the grant of summary judgment on Pietrangelo's public-accommodation and advertising claims do not alone establish a prima facie case under the Effects Clause. Because the Effects Clause does not make a defendant liable for "a one-time decision[] that affect[s] only one person," *McCaskill*, 36 F. Supp. 3d at 157, Pietrangelo is not excused from the requirement of "provid[ing] statistical evidence of a disparate impact from" The Wing's admission policy.  *Borum v. Brentwood Vill., LLC*, No. 16-cr-1723, 2020 WL 1508906, at *8 (D.D.C. 2020).

disproportionately on African-Americans." *Id.* This evidence was sufficient to establish a prima facie case of discriminatory effect and shifted the burden to the defendant. *Id.* at 48–49.

Pietrangelo clears this hurdle with two pieces of evidence: (1) The Wing admitted "no identifiabl[y] male members"; and (2) The Wing "admitted more than 10,000 women and non-binary persons." Pl.'s Second Reply at 31; *see* Diedra Nelson Dep. 162:3–4 (citing that the one admitted "male" was nonbinary); Defs.' Counter-Statement of Material Facts ¶ 15 ("As of September 2019 . . . The Wing had over 10,000 members across all locations and over 36,000 applicants."). Granted, unlike the plaintiffs in *Mitchell*, Pietrangelo does not offer expert analysis of The Wing's admissions data. But in this context, statistical expertise is not necessary because of the stark evidence Pietrangelo presents—*i.e.*, The Wing cannot point to a single man who was admitted among its tens of thousands of applicants. *Cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977) (noting statistical evidence of discrimination "come[s] in infinite variet[ies] and . . . their usefulness depends on all of the surrounding facts and circumstances").

The Wing argues that Pietrangelo's evidence is insufficient because The Wing "did not ask for prospective members' gender," so there are no means of identifying the number of male applicants. Defs.' Reply at 6. In other words, Pietrangelo cannot prove that men were disproportionately excluded from The Wing if he does not know how many male applicants there were. Even assuming The Wing is correct that applicant-level data on gender are not available, the Court "must view the evidence in the light most favorable to the non-moving party." *Gray v. Universal Serv. Admin. Co.*, 581 F. Supp. 2d 47, 52 (D.D.C. 2008). The Court is thus unable to assume, in The Wing's favor, that all applicants besides Pietrangelo were not male. Construing the evidence as such, Pietrangelo has presented enough evidence which "at a minimum allege[s]

*some* statistical disparity" stemming from The Wing admission's policy "however elementary" that inference may be. *Brady*, 360 F. Supp. 2d at 100.

Second, the burden thus shifts to The Wing to "show[] that one of the exceptions to the DCHRA justifies the discriminatory effect." *Mitchell*, 274 F. Supp. 2d at 48.  The Wing contends that its admissions practice "was consistent with business necessity."  Defs.' Cross-Mot. for Summ. J. at 11.  Under the DCHRA's business-necessity exception, "Any practice which has a discriminatory effect and which would otherwise be prohibited by this chapter shall not be deemed unlawful if it can be established that such practice . . . can be justified by business necessity." D.C. Code § 2-1401.03(a).  A successful business-necessity defense requires a "defendant [to] show that without the business necessity exception, the defendant's business could not be conducted." *Mitchell*, 274 F. Supp. 2d at 48.

The Wing, however, points to no record evidence suggesting a business necessity related to its admission policy. *See* Defs.' Cross-Mot. for Summ. J. at 10–11.  In a footnote responsive to Pietrangelo's separate public-accommodation claim, The Wing suggests "membership space was finite at all times relevant." *Id.* at 10 n.4.  But limited membership space is entirely unrelated to the sex or gender of admitted applicants to The Wing.  Moreover, the business-necessity exception "requires a good deal more than 'mere difficulty' in conducting a business by non-discriminatory means." *Mitchell*, 274 F. Supp. 2d at 48 (quoting *Nat. Motion by Sandra, Inc. v. D.C. Comm'n on Hum. Rts.*, 687 A.2d 215, 218 (D.C. 1997)).  Indeed, The Wing's "finite space" justification plainly fails under the business-necessity exception's plain terms: namely, "a 'business necessity' exception cannot be justified by the facts of increased cost to business, [or] business efficiency." D.C. Code § 2-1401.03(a).  The Court will deny The Wing's cross-motion for summary judgment on the Effects Clause claim because (1) there is at least a genuine dispute of material fact as to the

statistical significance of the disparity in The Wing's admission data and (2) The Wing's business-necessity defense is plainly insufficient.[12]

### B.    Remedies

Finally, the Court will address the parties' cross motions for summary judgment on punitive damages.  The Court will also address *sua sponte* whether Pietrangelo's claims for injunctive and declaratory relief are moot.

### 1.    *Punitive Damages*

The parties move for summary judgment on Pietrangelo's claim for punitive damages.  *See* Defs.' Mem. in Opp'n at 14–15.  Punitive damages are available under the DCHRA,  *see Arthur Young Co. v. Sutherland*, 631 A.2d 354, 370–71 (D.C. 1993), "subject only to the general principles governing any award of punitive damages," *Daka, Inc. v. Breiner*, 711 A.2d 86, 98 (D.C. 1998) (quoting *Sutherland*, 631 A.2d at 372).   "A showing of evil motive or actual malice is . . . required" for punitive damages.  *Sutherland*, 631 A.2d at 372; *see Primas v. District of Columbia*, 718 F. Supp. 2d 59, 61 (D.D.C. 2010); *see also Rogers v. Ingersoll-Rand Co.*, 971 F. Supp. 4, 12 (D.D.C. 1997) ("Punitive damages are properly awarded where the act of the defendant is accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury.").   "For a defendant's conduct to rise to this level, then, a defendant must at least discriminate in the face of a perceived risk that its actions will violate [the] law."  *Mitchell*, 274 F. Supp. 2d at 51–52 (cleaned up).  But

---

[12] Although Pietrangelo's reply to The Wing's cross-motion briefly suggests he "is entitled to summary judgment" on the Effects Clause claim, he has failed to move formally for summary judgment or to suggest there are no genuine disputes of material fact permitting summary judgment.

a plaintiff seeking punitive damages "need not show that a defendant's conduct is independently egregious." *Id.* at 52.

Pietrangelo has failed to produce enough evidence to rule in his favor as a matter of law, but he has pointed to enough evidence from which a jury "might return a verdict" in his favor. *Anderson*, 477 U.S. at 257. Summary judgment is thus inappropriate for either party. In the employment context, the Supreme Court has noted that "[t]here will be circumstances where intentional discrimination does not give rise to punitive damages liability." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999). For example, "the employer may simply be unaware of the relevant [legal] prohibition," the employer may "discriminate[] with the distinct belief that its discrimination is lawful," the plaintiff may succeed on a "novel or otherwise poorly recognized" legal theory of discrimination, "or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability." *Id.* at 536–37. As such, the Court's grants of summary judgment on Pietrangelo's public-accommodation and advertising claims may not alone be sufficient to award punitive damages. *See Arthur Young Co.*, 631 A.2d at 372 ("[T]he mere finding of discriminatory action, without more, will not support an award of punitive damages."). But The Wing fails to direct the Court to the sort of evidence described in *Kolstad* that would suggest it lacked awareness of the DCHRA's prohibitions. *See Kolstad*, 527 U.S. at 537. Indeed, a cursory review of the record suggests the contrary. The Wing launched a multiyear advertising campaign promoting itself as a "No Man's Land," posted jokes about men to its social-media accounts,[13] and did not offer any evidence that a cisgender man was granted membership.

---

[13] As discussed in Section III.A.1.i, *supra*, then-CEO of The Wing Audrey Gelman made statements undermining The Wing's possible defense that it "simply [was] unaware of the

33

In addition, there remains an outstanding issue for the jury to resolve: namely, whether The Wing's admission policy disproportionately excluded men in violation of the DCHRA's Effects Clause. *See Mitchell*, 274 F. Supp. 2d at 51–52 (denying the defendant's motion for summary judgment on a punitive-damages claim because the plaintiffs presented "evidence of gross disparities in [taxi] pickup rates" sufficient to establish a "genuine issue of material fact" as to whether the defendant "acted out of ill will or willfully disregarded plaintiffs' rights").

The Court thus concludes that there remain genuine issues of material fact about whether The Wing acted out of evil motive or actual malice and is thus liable for punitive damages. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).   It would thus be "inappropriate to take the issue of punitive damages away from the trier of fact." *Mitchell*, 274 F. Supp. 2d at 52.

2.   *Prospective Relief*

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies."  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).  The "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997) (cleaned up).  Although neither party raises the issue of whether Pietrangelo's claims for injunctive and declaratory relief are moot, this Court has an "affirmative" and continuing "obligation to ensure that it is acting within the scope of its jurisdictional authority . . . which includes the obligation to consider the possibility of mootness."  *Lindell v. Landis Corp. 401(k) Plan*, 640 F. Supp. 2d 11, 14 (D.D.C. 2009) (cleaned

---

relevant [legal] prohibition" against sex-based discrimination.  *Kolstad*, 527 U.S. at 537.  Upon learning that The Wing was under investigation for possible sex discrimination, Gelman tweeted, "[T]he Wing seems like it's gonna be O.K.: (Without men.)," and the investigation has "only gotten [The Wing] more press."  Pl.'s Statement of Material Facts ¶ 59.

Case 1:18-cv-01943-DLF-ZMF   Document 134   Filed 09/29/23   Page 35 of 36


up).  A claim becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Schmidt v. United States*, 749 F.3d 1064, 1068 (D.C. Cir. 2014) (cleaned up).  Under the voluntary-cessation exception to mootness, a defendant's "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953).  A defendant's intervening acts will render a case moot only if "there is no reasonable expectation" that the challenged practice will recur after the lawsuit's dismissal. *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *accord Jews for Jesus, Inc. v. Hillsborough Cnty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998) (quoting).  "The defendant carries the burden of demonstrating that there is no reasonable expectation that the wrong will be repeated." *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 648 (D.C. Cir. 2011) (cleaned up).

The Court previously held that The Wing's August 2018 adoption of a new membership policy did not moot Pietrangelo's request for injunctive and declaratory relief.  *See* June 4, 2019 Mem. Op. at 18, Dkt. 24.  The Court rejected The Wing's argument that the claims were moot because (1) "whether The Wing's new policy has actually cured the alleged discrimination remains in dispute"; and (2) under the voluntary-cessation exception to mootness, The Wing failed to show that there was "no reasonable expectation that the challenged practice [would] resume after the lawsuit is dismissed." *Id.* at 17–19.  But circumstances have indisputably changed over the last four years.  The Wing's Washington, D.C. location closed in March 2020, and The Wing itself wound down operations on August 30, 2022.  *See* Pl.'s Statement of Material Facts ¶ 15; Defs.' Resp. to Pl.'s Statement ¶¶ 79, 81.  To be sure, a business's closure is not alone sufficient to moot a claim for prospective relief.  In *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000), the Supreme Court held that a suit for injunctive and declaratory relief was not moot even though the plaintiff

"submitted an affidavit that it had ceased to operate." The Court engaged in a fact-specific inquiry, scrutinizing the plaintiff's affidavit, conduct during proceedings, and continued incorporation and ability to "again decide to operate." *Id.* at 287–88. Absent further briefing or evidence from the parties, the Court is not prepared to rule on whether it is "absolutely clear that" The Wing's "behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). The Court will thus order the parties to submit additional briefing and any appropriate affidavits on the issue of whether Pietrangelo's claims for prospective relief are now moot on or before October 13, 2023.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Pietrangelo's Motion for (Partial) Summary Judgment and grants in part and denies in part The Wing's Cross-Motion for Summary Judgment.[14] A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

September 29, 2023

---

[14] In his first reply brief, Pietrangelo contends the Court should "hold Defendants *and* their counsel in contempt for such continued ad hominem attack upon Plaintiff." Pl.'s First Reply at 3. The Court will deny this entirely meritless request. Pietrangelo has not proffered evidence "adequate to demonstrate a reasonable certainty that a violation [of this Court's orders] occurred." *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 30 (2014).