### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES E. PIETRANGELO, II, | |
| *Plaintiff*, | |
| v. | No. 18-cv-1943 (DLF) |
| REFRESH CLUB, INC., *et al.*, | |
| *Defendants*. | |

## <u>MEMORANDUM OPINION</u>

Plaintiff James E. Pietrangelo, II, proceeding *pro se*, brought this suit against Refresh Club, Inc. and The Wing DC, LLC (together, "The Wing") seeking monetary, injunctive, and declaratory relief for alleged violations of the D.C. Human Rights Act of 1977, D.C. Code § 2-1401.01 *et seq*, Dkt. 1. On September 29, 2023, the Court granted Pietrangelo summary judgment on his public-accommodation and advertising claims. The Court then ordered supplemental briefing on the potential mootness of Pietrangelo's requests for equitable relief and, on February 27, 2024, held a bench trial on compensatory and punitive damages. The parties completed their post-trial briefing on May 25, 2024. For the reasons that follow, the Court concludes that (1) Pietrangelo's claims for injunctive and prospective declaratory relief are moot; (2) Pietrangelo's claim for retrospective declaratory relief is not moot; and (3) Pietrangelo is entitled to $1,000 in compensatory damages and $2,000 in punitive damages.

## I.     BACKGROUND

The Court recapitulated the facts of this case at length in its earlier Memorandum Opinion and reiterates here only the facts essential to this opinion. *See Pietrangelo v. Refresh Club, Inc.*, No. 18-cv-1943, 2023 WL 6388880, at *1–3 (D.D.C. Sept. 29, 2023). On June 4, 2018, Plaintiff

James E. Pietrangelo, II, a 53-year-old man, applied for membership at The Wing DC, a workspace styling itself as "women-only." Pl.'s Statement of Material Facts as to Which There Is No Genuine Issue ¶¶ 1, 4–5, 8–9, 27, Dkt. 127-1. At that time, The Wing "did not have a formal, written membership policy and its practice was to admit as members only women and non-binary individuals," Defs.' Statement of Material Facts ¶ 10 (Defs.' Counter-Statement of Material Facts), Dkt. 128-3, so Pietrangelo was not admitted, *see id.* ¶ 15; Helen Dally Dep. at 20:6–7, 17–18, Dkt. 101-6. On August 20, 2018, Pietrangelo, proceeding *pro se*, filed a complaint against The Wing, seeking monetary, injunctive, and declaratory relief for alleged violations of the D.C. Human Rights Act of 1977 ("DCHRA"), D.C. Code § 2-1401.01 *et seq.* Compl. at 30–31, Dkt. 1. As relevant here, Pietrangelo seeks (1) "a declaration or declarations that Defendants' . . . practices violated/violate" the DCHRA and "were/are unlawful discriminatory practices"; (2) "temporary, preliminary, and permanent injunctions enjoining Defendants' unlawful discriminatory practices in the future, and remedying Defendants' unlawful discriminatory practices in the past—including injunctions requiring Defendants to grant Plaintiff membership in The Wing"; and (3) compensatory and punitive damages. *Id.* at 30.

On August 30, 2018, The Wing adopted a "formal, written membership policy . . . provid[ing] that all applicants will be evaluated based on their commitment to The Wing's mission, regardless of their perceived gender or gender identity." Defs.' Counter-Statement of Material Facts ¶¶ 11–12. The Wing then moved to dismiss Pietrangelo's claims under Rule 12(b)(1), arguing in relevant part that The Wing's new gender-neutral membership policy rendered his claims for declaratory and injunctive relief moot. *See* Mem. of L. in Supp. Of Defs.' Mot. to Dismiss at 19, Dkt. 11. The Court disagreed, holding that Pietrangelo's claims for declaratory and injunctive relief were not moot under the "voluntary cessation" exception: namely,

"it [was] not 'absolutely clear' that The Wing's newly inaugurated membership policy w[ould] prevent further gender discrimination." *Pietrangelo v. Refresh Club, Inc.*, No. 18-cv-1943, 2019 WL 2357379, at *9 (D.D.C. June 4, 2019).

In March 2020, almost a year after the Court's denial, The Wing closed its Washington, D.C. location. Defs.' Counter-Statement of Material Facts ¶ 16. The Wing later "ceased all business operations effective August 30, 2022" at all locations. *Id.* ¶ 17. On December 8, 2022, The Wing—under its corporate name Refresh Club, Inc.—dissolved in Delaware. *See* Decl. of Geoffrey Raicht Ex. A, at 2, Dkt. 135-2. Both parties subsequently moved for summary judgment, *see* Dkts. 127, 129, and the Court granted in part and denied in part both motions on September 29, 2023, *see* Dkts. 133, 134. Specifically, the Court granted Pietrangelo summary judgment on his public-accommodation and advertising claims, denied The Wing summary judgment on the disparate-impact claim, and granted The Wing summary judgment on the aiding-and-abetting claim. *See Pietrangelo*, 2023 WL 6388880, at *4–15.

In its opinion, the Court *sua sponte* raised the potential mootness of Pietrangelo's claims for prospective relief, acknowledging that "circumstances ha[d] indisputably changed" since the denial of The Wing's 2019 motion to dismiss on mootness grounds. *See id.* at *16. The Court "thus order[ed] the parties to submit additional briefing and any appropriate affidavits on the issue of whether Pietrangelo's claims for prospective relief are now moot." *Id.* The parties subsequently briefed the issue, *see* Dkts. 135–136, and the Court heard argument on October 27, 2023.

Also, the Court's September 29, 2023 opinion denied both parties' motions for summary judgment on punitive damages. *See id.* at *15–16. Pietrangelo waived his right to a jury trial, *see* Notice of Waiver of Jury Trial, Dkt. 139, and the Court held a bench trial on February 27, 2024 to determine whether Pietrangelo is entitled to compensatory and/or punitive damages. *See* Min.

Order of Feb. 28, 2024.  He seeks $4 million in compensatory damages ($2 million for each violation) and $8 million in punitive damages ($4 million for each violation).  *See* Mem. in Supp. of Pl.'s Damages at 1, Dkt. 141.

At the bench trial, the Court limited the evidence to the summary-judgment record and Pietrangelo's trial testimony.  *See* Bench Trial Tr. at 75:7–76:2.  Although Pietrangelo sought to introduce evidence of online third-party comments, the Court excluded this evidence because it was not disclosed in discovery.  *See id.* at 75:19–20.  Following trial, the parties submitted post-trial briefs.  *See* Dkts. 143, 144, 145, 146, 148.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(h)(3), "[i]f the [C]ourt determines at any time that it lacks subject-matter jurisdiction, [it] must dismiss the action."  "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."  *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983)); *see also* U.S. Const. art. III, § 2.  To ensure an actual controversy remains extant, mootness must be assessed at "all stages of review, not merely at the time the complaint is filed," and the Court may raise the issue of mootness *sua sponte*.  *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013) (cleaned up); *see Munn Bey v. Dep't of Corr.*, 839 F. Supp. 2d 1, 6 n.5 (D.D.C. 2011).  If the court determines that it lacks jurisdiction because a claim is moot, the court must dismiss the claim.  Fed. R. Civ. P. 12(b)(1), 12(h)(3).

A case or claim is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Schmidt v. United States*, 749 F.3d 1064, 1068 (D.C. Cir. 2014) (quoting *Larsen v. U.S. Navy*, 525 F.3d 1, 3-4 (D.C. Cir. 2008)).  This occurs when, for

example, "intervening events make it impossible to grant the prevailing party effective relief," *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (cleaned up), or when the Court's decision "will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Aref v. Lynch*, 833 F.3d 242, 250 (D.C. Cir. 2016) (quoting *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011)).

"The initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot, but the opposing party bears the burden of showing an exception applies." *Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (citations omitted). One well-established exception is based on "a party's 'voluntary cessation' of the challenged activity. As a general rule, a defendant's 'voluntary cessation of allegedly illegal conduct does not deprive [a court] of power to hear and determine the case.'" *ABA*, 636 F.3d at 648 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). "Voluntary cessation will only moot a case if 'there is no reasonable expectation . . . that the alleged violation will recur' and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Id.* (quoting *Davis*, 440 U.S. at 631). The defendant carries the "heavy" burden of showing "that there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (cleaned up).

Further, compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (cleaned up). These include "economic damages, which are a concrete loss, and damages for pain, suffering, and mental anguish for which the amount of damages is not a sum certain." *Dumpson v. Ade*, No. 18-cv-1011, 2019 WL 3767171, at *7 (D.D.C. Aug. 9, 2019) (cleaned up). "[C]ompensatory damages must be proven and cannot be

presumed," *Peyton v. DiMario*, 287 F.3d 1121, 1126 (D.C. Cir. 2002) (citing *Carey v. Piphus*, 435 U.S. 247, 263–64 (1978)), and the plaintiff bears the burden of proving such relief is warranted, *see Jean-Baptiste v. District of Columbia*, 931 F. Supp. 2d 1, 14 (D.D.C. 2013).

Punitive damages "punish[] unlawful conduct and deter[] its repetition." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). Punitive damages are "to be awarded only in cases of outrageous or egregious wrongdoing where the defendant has acted with evil motive, actual malice, or in willful disregard for the rights of the plaintiff." *Halcomb v. Woods*, 767 F. Supp. 2d 123, 137 (D.D.C. 2011) (quoting *Rosenthal v. Sonnenschein Nath & Rosenthal, LLP*, 985 A.2d 443, 455 (D.C. 2009)). The plaintiff carries "this high substantive burden" of "prov[ing] egregious conduct and the requisite mental state by clear and convincing evidence." *Id.* (quoting *Rosenthal*, 985 A.2d at 456). Any such award is subject to the Due Process Clause of the Fourteenth Amendment, which prohibits "the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 416.

## III.   ANALYSIS

### A.   Equitable Relief

The Court has an "affirmative" and continuing "obligation to ensure that it is acting within the scope of its jurisdictional authority . . . which includes the obligation to consider the possibility of mootness." *Lindell v. Landis Corp. 401(k) Plan*, 640 F. Supp. 2d 11, 14 (D.D.C. 2009) (cleaned up). The Wing argues that Pietrangelo's claims for injunctive and declaratory relief are moot "because (1) there is no longer a live controversy between the parties; (2) there is no reasonable expectation the alleged violations will recur; and (3) interim events have completely and irrevocably eradicated the effects of the alleged violations." Defs.' Supp. Mem. at 1, Dkt. 135. The Wing thus seeks the dismissal of Pietrangelo's claims for injunctive and declaratory relief.

*See id.* at 8.  Pietrangelo disputes the mootness of his claims, principally arguing under the voluntary-cessation exception that The Wing could reopen and continue to operate in a discriminatory manner.  *See* Pl.'s Br. Re Injunctive & Declaratory Relief at 2–9, Dkt. 136.  The Court will dismiss as moot Pietrangelo's claims for injunctive and prospective declaratory relief, but it will not dismiss as moot Pietrangelo's claims for retrospective declaratory relief.

        1.    *Injunctive Relief*

Pietrangelo seeks "temporary, preliminary, and permanent injunctions enjoining Defendants' unlawful discriminatory practices in the future, and remedying Defendants' unlawful discriminatory practices in the past—including injunctions requiring Defendants to grant Plaintiff membership in The Wing."[1]  Compl. at 30.  Based on The Wing's closure and later dissolution,[2] the Court will dismiss as moot Pietrangelo's claim for injunctive relief.

The Wing has provided sufficient evidence "that there is no reasonable expectation that the wrong will be repeated," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (cleaned up),

---

[1] Although Pietrangelo's prayer for injunctive relief seeks to "remedy[] . . . practices in the past," Compl. at 30, the relief sought is entirely prospective: namely, Pietrangelo seeks future membership in The Wing, *see id.* ("including injunctions requiring Defendants to grant Plaintiff membership in The Wing").  "[A]n injunction is a prospective form of relief, designed to prevent future injury," and Pietrangelo seeks to prevent future discrimination in membership.  *Nigerians in Diaspora Org. Ams. v. Key*, No. 19-cv-3015, 2021 WL 811094, at *11 (D.D.C. Mar. 3, 2021).

[2] The Court rejects The Wing's principal argument that Pietrangelo's injunctive-relief claim is moot because of The Wing's adoption of a new membership policy that evaluates applicants "based on their commitment to The Wing's mission, regardless of their perceived gender or gender identity."  Defs.' Supp. Mem. at 5; *id.* at 4–5 (citing *White v. Bank of Am., N.A.*, 200 F. Supp. 3d 237, 244 (D.D.C. 2016)).  As discussed *supra*, the Court previously rejected this argument because it went to the heart of the parties' dispute—*i.e.*, whether The Wing's written membership policy violated the DCHRA facially or in effect.  *Pietrangelo*, 2019 WL 2357379, at *8.  Moreover, adjudicating mootness on this basis would effectively require the Court to enter a declaratory judgment in The Wing's favor that the written membership policy did not violate the DCHRA.  *White*, 200 F. Supp. 3d at 244.  It would amount to an "advisory opinion[]" years after The Wing's closure that "cannot affect the rights of the litigants in the case before it."  *St. Pierre v. United States*, 319 U.S. 41, 42 (1943) (per curiam).

and "events have completely and irrevocably eradicated the effects of the alleged violation," *ABA*, 636 F.3d at 648 (cleaned up).  In the Court's September 29, 2023 decision, it directed the parties to *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000), in which the Supreme Court held that "[s]imply closing [a business] is not sufficient to render [a] case moot."  In that case, the City of Erie, Pennsylvania enacted a law banning public nudity, and Pap's A.M., the owner of a "nude-dancing establishment" called "Kandyland," challenged the law, seeking injunctive and declaratory relief.  *Id.* at 282–84.  The Pennsylvania Supreme Court "conclud[ed] that the public nudity provisions of the ordinance violated [Pap's] rights to freedom of expression."  *Id.* at 284.  The City of Erie petitioned for a writ of certiorari, and "[s]hortly thereafter, Pap's filed a motion to dismiss the case as moot, noting that Kandyland was no longer operating as a nude dancing club, and Pap's was not operating a nude dancing club at any other location."  *Id.* at 287.  Noting that "this is not a run of the mill voluntary cessation case," the Supreme Court rejected Pap's mootness argument for several reasons: (1) "Pap's is still incorporated under Pennsylvania law," meaning "it could again decide to operate a nude dancing establishment"; (2) Pap's failed, "despite its obligation to the Court, to mention a word about the potential mootness issue in its brief in opposition to the petition for writ of certiorari . . . even though . . . Kandyland was closed"; (3) the City of Erie "has an ongoing injury because it is barred from enforcing the public nudity provisions of its ordinance" under the Pennsylvania Supreme Court decision; and (4) the Court had "an interest in preventing litigants from attempting to manipulate the Court's jurisdiction to insulate a favorable decision from review."  *Id.* at 287–88.

This case is distinguishable from *City of Erie* on each of the bases identified by the Supreme Court.  *First*, unlike Pap's, which was "still incorporated under Pennsylvania law" at the time of its mootness challenge, *City of Erie*, 529 U.S. at 287, The Wing is dissolved under Delaware law.

The Wing provided the Court with a certificate of dissolution from the State of Delaware, confirming that Refresh Club, Inc., the sole member of The Wing D.C. LLC, was dissolved on December 8, 2022.  *See* Decl. of Geoffrey Raicht Ex. A.  The Wing also offers a declaration from Geoffrey Raicht, the Chief Restructuring Officer of Refresh Club, Inc., and Raicht states that "[d]efendants ceased all business operations effective August 30, 2022," Refresh Club, Inc.'s "board of directors [and shareholders] voted to dissolve RCI's corporate existence," "[d]efendants have no assets," and "[t]he wind down and liquidation of [d]efendants is complete."  Decl. of Geoffrey Raicht ¶¶ 4–8.  According to  The Wing, "[t]here is no plan or intention to revive The Wing."  Defs.' Supp. Mem. at 5 (citing Raicht Decl. ¶ 8).  The Court also takes notice that The Wing has not operated in Washington, D.C. for over four years or globally in the last two or so years.  *Second*, unlike Pap's, the Court here finds no evidence that The Wing hid the ball on dissolution.   Indeed, The Wing's summary-judgment briefing was upfront about ceasing operations and filing for dissolution, which prompted the Court's initial mootness inquiry.  *See* Defs.' Counter-Statement of Material Facts ¶ 81, Dkt. 128-3; Defs.' Statement of Material Facts ¶¶ 16–17.  *Third*, Pietrangelo would not suffer "ongoing injury" within the meaning of *City of Erie* if the Court finds his injunctive-relief claims moot.  In *City of Erie*, a finding of mootness would have "insulate[d] a favorable decision [in Pap's favor] from review," 529 U.S. at 288, but there is no such risk here because there is no "unvacated decision below" injuring Pietrangelo, *Pharmachemie B.V. v. Barr Lab'ys, Inc.*, 276 F.3d 627, 632 (D.C. Cir. 2002).  *Fourth*, the Court raised mootness *sua sponte*, pouring cold water on the theory that The Wing is "manipulat[ing] the Court's jurisdiction," especially given the Court's summary-judgment grant in Pietrangelo's favor.  *City of Erie*, 529 U.S. at 288.

Pietrangelo provides a litany of counterarguments, but the Court remains unpersuaded.  He argues (1) The Wing "or their successor(s) . . . have the method and means to easily re-open The Wing"; (2) Raicht "was curiously described as The Wing's sole *remaining* director, and was even more curiously titled . . . 'Chief <u>Restructuring</u> Officer'" not "Chief <u>Dissolution</u> Officer"; (3) The Wing has an "active" incorporation in the State of New York; (4) The Wing's "obstructive 'conduct during proceedings' in this case" should cast doubt on the "veracity of The Wing's purported dissolution"; (5) "the timing of The Wing's announced closure" reflects deception because The Wing's "August 30, 2022 announced closure came on the heels of [Pietrangelo's] July 27, 2022 motion for sanctions"; and (6) "the larger societal importance of addressing the injunctive-relief claim at issue . . . counsels not finding that claim moot."  Pl.'s Br. Re Injunctive & Declaratory Relief at 4–6.

Pietrangelo's arguments are largely without factual or legal support, and some arguments—especially (2), (4), and (5)—verge on the frivolous.  The Court will briefly address those arguments that have some weight.  *See Sun v. District of Columbia*, 133 F. Supp. 3d 155, 168 n.6 (D.D.C. 2015) ("[I]t is not the Court's job to canvass the record for documents supporting a *pro se* party's position.").  As to (1), Pietrangelo offers nothing more than speculation that The Wing's parent company could reopen "even if in different buildings than before."  Pl.'s Br. Re Injunctive & Declaratory Relief at 3–4.  Even assuming The Wing's parent company has significant assets, *see id.*, that does not specifically undermine the veracity of the certificate of dissolution and testimony from Raicht, nor does it counter the observable fact that The Wing's Washington D.C. location has remained closed for over four years.  Even if the parent company were to reopen The Wing—albeit under a different banner, the Court would lack jurisdiction over the new entities, which would be nonparties.  Ruling on Pietrangelo's claim for injunctive relief

would amount to "an advisory opinion as to other potential cases, with no effect on the *present* parties." *Pharmachemie B.V.*, 276 F.3d at 632 (emphasis added).

As to (3), Pietrangelo suggests The Wing is not actually dissolved based on Refresh Club, Inc.'s New York "Entity Information" page. This too lacks merit. True, on the website for the New York Department of State Division of Corporations, Refresh Club, Inc.'s "Entity Status" is described as "Active." Decl. of James E. Pietrangelo, II Ex. 2 at 1, Dkt. 136-2. But upon further inspection, the New York "Entity Information" page does not cast doubt on The Wing's evidence of its corporate dissolution. To start, the "Jurisdiction" listed is "Delaware," and The Wing's corporate-dissolution statement is clear that The Wing is dissolved in that state. *Id.* Further, the New York "Entity Information" page is outdated, as evidenced by the "Statement Status" listed as "Past Due Date," the latest filing occurring on January 15, 2020, and the "Chief Executive Officer's Name" listed as The Wing's former CEO Audrey Gelman. *See id.* The Court thus rejects Pietrangelo's suggestion that the New York "Entity Information" page "raises doubt[s]" as to the "certificate of dissolution." Pl.'s Br. Re Injunctive & Declaratory Relief at 5.

As to (6), the Court disagrees with Pietrangelo's contention that "as in *City of Erie* . . . the larger societal importance of addressing the injunctive-relief claim" counsels against mootness. Pl.'s Br. Re Injunctive & Declaratory Relief at 6. Pietrangelo mischaracterizes *City of Erie*'s reasoning. To the extent the Supreme Court considered factors besides the reasonable likelihood of Pap's reopening, the Court raised its "interest in preventing litigants from attempting to manipulate the Court's jurisdiction," not the social importance of the underlying claims. *City of Erie*, 529 U.S. at 288. For the reasons stated *supra*, the Court flatly rejects any suggestion The Wing seeks to improperly manipulate the Court's jurisdiction.

In sum, The Wing has persuaded the Court that, based on its dissolution and cessation of global operations, "it can be said with assurance that 'there is no reasonable expectation'" that The Wing will reopen and reinstitute its challenged membership policy. *Davis*, 440 U.S. at 631 (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).  Further, now that The Wing is defunct, the forward-looking "effect[]" of the challenged membership policy has been "eradicated." *Id.*  Given The Wing's dissolution, the Court lacks jurisdiction to enjoin The Wing prospectively and will dismiss Pietrangelo's claim for injunctive relief.

2.    *Declaratory Relief*

Pietrangelo seeks "a declaration or declarations that Defendants' above-alleged practices violated/violate" the DCHRA and "were/are unlawful discriminatory practices."  Compl. at 30. As the Court reads the complaint, Pietrangelo requests two different forms of declaratory relief. First, he seeks prospective relief that The Wing's membership policy as it exists (i.e., with the August 2018 written membership policy in force) violates the DCHRA.   Second, he seeks retrospective relief that The Wing's membership policy at the time Pietrangelo applied violated the DCHRA.   The Court will dismiss as moot Pietrangelo's prospective claim but not his retrospective claim.

i.    Prospective Declaratory Relief

For much the same reason the Court will dismiss Pietrangelo's claim for injunctive relief as moot, the Court will dismiss his claim for prospective declaratory relief as moot.   "In determining whether a request for declaratory relief has become moot, 'the question . . . is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality to warrant the issuance of a declaratory judgment*.'"  *Conyers v. Regan*, 765 F.2d 1124, 1128 (D.C. Cir. 1985) (quoting

*Preiser v. Newkirk*, 422 U.S. 395, 402 (1975)). Further, "the D.C. Circuit has indicated that where a plaintiff seeks both declaratory and injunctive relief pertaining to unlawful agency action, and where the latter has been mooted, an outstanding request for the former will not operate to bar mootness." *Chavis v. Garrett*, 419 F. Supp. 3d 24, 36–37 (D.D.C. 2019) (cleaned up).

Pietrangelo requests a declaration that The Wing's membership policy as a present and forward-looking matter violates the DCHRA. But the Court simply cannot afford the requested relief because the challenged membership policy no longer exists by virtue of The Wing's dissolution. *See La Botz v. FEC*, 889 F. Supp. 2d 51, n.2 (D.D.C. 2012) ("[I]f Article III's case-or-controversy requirement is to have any meaning, the court's opinion must consist of something more than helpful advice. It must be capable of remedying the plaintiff's injury."). A declaration of present or forward-looking unlawfulness under the DCHRA would amount to an advisory opinion because there is no "controversy of 'sufficient immediacy and reality' to warrant declaratory relief." *Conyers*, 765 F.2d at 1128 (quoting *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975)). Moreover, the Court's mootness analysis under *City of Erie* applies with equal force here because *City of Erie* adjudicated the mootness of both injunctive and prospective declaratory relief. *See City of Erie*, 529 U.S. at 287–89. The Court will thus dismiss Pietrangelo's claim for prospective declaratory relief as moot.

ii.     Retrospective Declaratory Relief

The Court will not, however, dismiss as moot Pietrangelo's claim for retrospective declaratory relief—*i.e.*, a declaration that The Wing applied an unlawful membership policy at the time of his application. "[C]ourts have held that plaintiffs may seek a retrospective declaratory judgment—that is, declaratory relief premised on past harm—when the request is intertwined with a claim for monetary damages that requires [the court] to declare whether a past constitutional

violation occurred." *Creamer v. District of Columbia*, No. 22-cv-1874, 2023 WL 4027513, at *1 (D.D.C. June 15, 2023) (cleaned up).  This makes good sense: if a court holds that a plaintiff is entitled to monetary damages, the court has, in effect, declared that the defendant invaded the plaintiff's legal rights.  *Cf. Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ("When a right is violated, that violation imports damage in the nature of it and the party injured is entitled to a verdict for nominal damages." (cleaned up)).  As such, if a plaintiff's claim for damages is not moot, his claim for retrospective declaratory relief as to the same injury is unlikely to be moot.

In *Coleman ex rel. Bunn v. District of Columbia*, for example, plaintiffs brought a Takings Clause challenge against a District of Columbia tax-sale law on behalf of "all District property owners who suffered" under the law, seeking monetary damages and a declaratory judgment.  306 F.R.D. 68, 71–72 (D.D.C. 2015).  After the filing of the lawsuit, the D.C. Council passed two temporary amendments to the District's tax-sale law.  *See id.* at 72–73.  The plaintiffs moved for class certification, seeking to certify a "damages class" and "declaratory relief class," and the District of Columbia opposed the motion, arguing in relevant part that "the Declaratory Relief Class lacks standing because it contains members whose claims would be rendered moot by the enactment of amendments to the District's tax-sale law."  *Id.* at 73–77.  The court disagreed because the plaintiffs "defin[ed] the Declaratory Relief Class" as "identical to the Damages Class"—*i.e.*, the "Declaratory Relief Class" sought "a retrospective declaratory judgment because its claims [were] intertwined with a claim for monetary damages."  *Id.* at 74–75 (cleaned up).

As in *Coleman*, Pietrangelo's claim for retrospective declaratory relief is not moot. Pietrangelo seeks a backward-looking declaration that The Wing violated the DCHRA when it evaluated his membership application.  In other words, he seeks redress for "a completed violation of a legal right" under the DCHRA, and The Wing's subsequent dissolution does not nullify the

redressability of this past injury. *Uzuegbunam*, 141 S. Ct. at 802. Further, neither party suggests Pietrangelo's claim for compensatory damages is moot. Pietrangelo's retrospective-declaratory-relief claim is "intertwined with [his] claim for monetary damages," as evidenced by the Court's September 29, 2023 memorandum opinion, which held that Pietrangelo is entitled to, at the very least, compensatory damages because The Wing violated the DCHRA. *Coleman*, 306 F.R.D. at 75 (cleaned up). Indeed, the Court's prior order implicitly granted the retrospective declaratory relief to which Pietrangelo is lawfully entitled. *See Hailu v. Morris-Hughes*, No. 22-cv-20, 2023 WL 2184552, at *4 (D.D.C. Feb. 23, 2023) ("Because [the plaintiff] has standing to seek compensatory damages, and resolving his claims may require this court to declare whether the [defendant] violated his constitutional rights, [the plaintiff] is entitled to seek declaratory judgments determining that the [defendant] acted unlawfully."). The Court thus concludes that the claim for retrospective relief is not moot. Accordingly, the Court will order the parties to file a proposed declaration.

**B.     Damages**

On June 26, 2024, the Court held a bench trial to determine whether Pietrangelo is entitled to any compensatory and/or punitive damages. Pietrangelo contends he is entitled to $12 million in damages. *See* Mem. in Supp. of Pl.'s Damages at 1, Dkt. 141. The Wing argues that he is entitled to, at most, nominal damages, *see* Defs.' Post-Trial Br. at 1–2, Dkt. 144. Based on the evidence in the record and trial testimony, the Court concludes that Pietrangelo is entitled to $1,000 in compensatory damages and $2,000 in punitive damages.

1.     *Compensatory Damages*

The DCHRA authorizes a court to "grant any relief it deems appropriate," D.C. Code § 2-1403.16, including "the payment of compensatory damages," *id.* § 2-1403.13. A plaintiff may

recover compensatory damages for "humiliation, embarrassment, and emotional pain and suffering," even if he suffers "no physical or medical injury." *Sumes v. Andres*, 938 F. Supp. 9, 13 (D.D.C. 1996). And "[a] finding of humiliation and embarrassment flows naturally from a finding of discrimination." *Id.*

In calculating compensatory damages for a DCHRA violation, courts typically assess what is "appropriate" based on the testimony of the plaintiff and the surrounding context. *Id.* Courts also consider whether aggravating factors warrant enhanced damages. *See Joel Truitt Mgmt, Inc.* v. *D.C. Comm'n on Hum. Rts.*, 646 A.2d 1007, 1010 (D.C. 1994). But "the weight of the evidence must support the damages given." *Jean-Baptiste*, 931 F. Supp. 2d at 20.

Compensatory damages that are based on non-economic harms, such as humiliation, embarrassment, and emotional pain, can be difficult to quantify. For assistance in determining the value of such intangible harms, the Court is guided by the decisions of other courts. In *Sumes*, for example, a court in this District awarded $10,000 to a plaintiff based on a doctor's refusal to give her prenatal care because she was deaf. *Sumes*, 938 F. Supp. at 12–13. The award was based in part on the plaintiff's testimony that the defendant's actions made her feel "angry, irritated, dismissed, and like less of a person." *Id.* at 13. It was also based on the surrounding context: namely, the plaintiff was pregnant; she was in the defendant's office for her first visit to an obstetrician-gynecologist; and she was "in the examining room disrobed, except for a hospital gown, from the waist down." *Id.* These circumstances bolstered the plaintiff's claim for "emotional damages," but they were not deemed sufficiently "egregious" to warrant any enhancement. *Id.* at 13 n.5.

For a showing of discrimination without any aggravating circumstances, other courts have awarded similar amounts. Federal courts in New York, for example, follow the lead of the New

York City Human Rights Commission and award $1,000 in damages when plaintiffs have not "establish[ed] any particular damage other than what a decent and reasonable individual would suffer when faced with such ignorant behavior." *Kreisler v. Second Ave. Diner Corp.*, No. 10-cv-7592, 2012 WL 3961304, at *14 (S.D.N.Y. Sept. 11, 2012) (quotation omitted), *aff'd*, 731 F.3d 184 (2d Cir. 2013); *see, e.g.*, *Shariff v. Radamar Meat Corp.*, No. 11-cv-6369, 2014 WL 1311563, at *4 (E.D.N.Y. Feb. 14, 2014) (awarding to a disabled plaintiff unable to access a supermarket $1,000 in compensatory damages for "mental anguish and emotion[al] distress, including . . . depression, humiliation, [and] embarrassment"), *report and recommendation adopted as modified*, 2014 WL 1311565 (E.D.N.Y. Mar. 31, 2014)); *Shalto v. Bay of Bengal Kabob Corp.*, No. 12-cv-920, 2013 WL 867429, at *10 (E.D.N.Y. Feb. 6, 2013) (reducing damages award from $25,000 to $1,000 for a disabled plaintiff unable to access a restaurant), *report and recommendation adopted as modified*, 2013 WL 867420 (E.D.N.Y. Mar. 7, 2013)).  Although the New York City Human Rights Commission occasionally awards damages over $5,000, those cases involve "extreme circumstances," such as insults or demeaning conduct toward the plaintiff.  *Kreisler*, 2012 WL 3961304, at *15.

Aggravating circumstances often warrant a higher damages award.  One such aggravator warranted an award of $35,000 in *Joel Truitt Management, Inc.*  646 A.2d at 1010.  In that case, a landlord discriminated against a tenant who had AIDS, notifying the tenant in a written memorandum that "trades people" would not come work on his apartment until he provided a certificate from a "qualified health authority" that it was safe for them to enter.  *Id.* at 1008.  A key driver of the damages award was an aggravating factor: namely, the landlord's "untrue derogatory statements."  *Id.* at 1010.  Specifically, the D.C. Human Rights Commission "found no basis for the [landlord's] implied assertion" that the tenant "kept hypodermic needles in his apartment" or

otherwise permitted unsanitary conditions. *Id.* at 1010 n.6. The D.C. Court of Appeals affirmed the damages award, concluding that the judge had not committed an abuse of discretion by enhancing the award to $35,000, even though the Commission had awarded $20,000 in a factually similar case. *See id.* at 1010.

But, as *Sumes* and *Joel Truitt Management* reflect, a damages award must be supported by record evidence. In *Jean-Baptiste*, a jury awarded $3.5 million to a plaintiff who alleged sexual harassment and retaliation by District of Columbia employees, in violation of both Title VII and the DCHRA. 931 F. Supp. 2d at 8. Reviewing the award, the court granted remittitur because the plaintiff's "testimony regarding her injuries simply was not sufficient to support" an award that large. *Id.* at 20. Although the court credited the testimony of the plaintiff about her "stress, anxiety, and depression," it also noted that she "offered no testimony from a medical or psychological professional regarding the impact the harassment and retaliation had on her physical or mental health." *Id.* Her only corroboration was the testimony of a co-worker that she looked "stressed, frustrated, and kind of nervous." *Id.* (cleaned up). The court held that the most the plaintiff's testimony could support was an award of compensatory damages of $350,000. *Id.* at 21; *see also Liberatore v. CVS N.Y., Inc.*, 160 F. Supp. 2d 114, 120–21 (D.D.C. 2001) (reducing a damages award for emotional distress from $1.1 million to $200,000 because the plaintiff's "testimony alone does not provide the substantial evidentiary basis needed to warrant an award of this amount").

Here, Pietrangelo has established that The Wing violated the DCHRA's public-accommodation and advertising provisions. *See Pietrangelo*, 2023 WL 6388880, at *7, 13. The Court credits his testimony that his rejection based on his sex and The Wing's advertising practices caused "humiliation," or a "feeling of being sort of demeaned." Bench Trial Tr. at 18:12–14; *see*

*Sumes*, 938 F. Supp. at 13 (crediting the testimony of a plaintiff that suffering discriminatory conduct made her feel "angry, irritated, dismissed, and like less of a person").  The Court also credits his "great indignity and outrage" at The Wing for "thumbing [its] nose at the law and at [his] rights under the [DCHRA] to not be discriminated against based on sex."[3]  *Id.* at 18:19–20, 19:22–24.  Such feelings "flow[] naturally from a finding of discrimination."  *Sumes*, 938 F. Supp. at 13.

That said, Pietrangelo has not persuaded the Court that he suffered any additional harms justifying an enhancement in compensatory damages.  First, Pietrangelo offered no evidence that The Wing's practices caused acute harm to his mental health.  Throughout his testimony, Pietrangelo testified about his humiliation and embarrassment at a high level of generality, *see, e.g.*, Bench Trial Tr. at 18:9–23, but he offered no evidence that The Wing's conduct caused specific deleterious effects in his life.  Without any such concrete details, Pietrangelo's testimony about his degree of embarrassment (e.g., facing "the darkest time" in his life) appeared exaggerated and uncredible.  *Id.* at 20:16.  When pushed by the Court, he also admitted that his mental health did not get "to the point where [he] ever sought medical treatment."  *Id.* at 20:11–12.  Similar to *Jean-Baptiste*, the Court is limited in its ability to award enhanced damages when the only evidence of emotional damages comes from the plaintiff's "self-serving testimony," not that of a medical professional.  931 F. Supp. 2d at 20 (cleaned up).

---

[3] The Court asked the parties to brief whether Pietrangelo's compensatory damages are time capped based on his limited residency (from 2018 to 2019) in Washington, D.C.  *See* Bench Trial Tr. at 57:22–23.  Ultimately, however, there is no need to prorate Pietrangelo's damages because the Court does not credit his testimony about the economic value of lost opportunities at The Wing.  In addition, it would not be reasonable (or even possible) to prorate Pietrangelo's damages because the evidence he submitted in support of his claim of emotional injury is far too general in nature. *See Jean-Baptiste*, 931 F. Supp. 2d at 20.

Second, Pietrangelo did not offer any solid evidence about the value of opportunities available at The Wing.  He testified that, as a member of The Wing, he could have rubbed shoulders with Hollywood A-listers, venture capitalists, and political figures.  *See id.* at 30:1–22, 31:2–25. But this testimony was, at bottom, speculative and lacked a clear tangible benefit to his projects, including screenwriting, producing, writing books, and *pro se* litigation.  For example, the Court did not find credible Pietrangelo's testimony that he expected, as a member of The Wing, to advance his career by handing a copy of his screenplay to a guest speaker like Reese Witherspoon. *See id.* at 35:17–36:12.  Such speculation is not a proper basis for an award of compensatory damages.  *See Zoerb v. Barton Protective Servs.*, 851 A.2d 465, 470–71 (D.C. 2004).

Third, as The Wing effectively elicited on cross-examination, Pietrangelo took no efforts to mitigate his damages.  "Mitigation requires a party to take reasonable steps after it has been injured to prevent further damage from occurring."  *Adenariwo v. Fed. Mar. Comm'n*, 808 F.3d 74, 80 (D.C. Cir. 2015).  "[C]lassic examples of mitigation" include "procuring a substitute" and "repairing harm that would otherwise cause consequential losses."  *Id.*  The "injured party" must take "beneficial steps to prevent *further* damages."  *Id.*  On cross-examination, Pietrangelo more or less admitted he took no steps to mitigate his damages after The Wing rejected his application. *See* Bench Trial Tr. at 49:24–51:23.  He testified that he tried to mitigate by bringing suit, *see id.* at 51:9–10, but otherwise admitted that he did not seek to join any other coworking space despite having toured ten in the area and did not seek mental-health treatment, *see id.* at 20:10–12, 24:10– 18.  He further explained that joining another coworking space would have been impracticable because none could compete with The Wing's offerings, including its "Danish decor" and "curated art."  *Id.* at 25:16, 19.  But the duty to mitigate does not require a perfect substitute, only a "reasonable" one.  *Adenariwo*, 808 F.3d at 80.  And the Court did not find credible Pietrangelo's

testimony that The Wing's superior aesthetics prevented him from joining another coworking space with lesser features.

Fourth, Pietrangelo's arguments based on allegedly derogatory comments are unpersuasive. Specifically, Pietrangelo points to (1) Former CEO Audrey Gelman's statement that he is a "garden-variety kook" and (2) The Wing's representation that he is a "serial litigant." Mem. in Supp. of Pl.'s Damages at 12. As to the former, Pietrangelo admits that he learned about the "garden-variety kook" statement only during discovery. *See* at Pl.'s Mot. for Partial Summ. J. at 40, Dkt. 127. Pietrangelo offers no concrete evidence that the statement adversely affected him at or around the time of his rejection from The Wing or at any time thereafter. And in any event, Gelman made the statement privately to a *Daily Beast* reporter, and it was apparently not published. As to the latter statement, the Court disagrees that the characterization of Pietrangelo as a "serial litigant" is derogatory or untrue. This is not a case like *Joel Truitt Management, Inc.* in which the defendant baselessly stated that the plaintiff had hypodermic needles strewn on his apartment floor. *See* 646 A.2d at 1010 n.6. Here, in contrast, The Wing effectively elicited on cross-examination that Pietrangelo has filed numerous *pro se* lawsuits in various jurisdictions. *See* Bench Trial Tr. at 53:22–56:19. Indeed, Pietrangelo stated on direct examination that he wanted to join The Wing, in part, to have a quiet place to write briefs for one of his other *pro se* cases. *See id.* at 23:9–10, 53:25–54:9. As such, the "serial litigant" comment appears anchored in reality.

Finally, The Wing's conduct, though illegal, was not aggravated. The conduct alleged here falls far short of that in cases in which a defendant has placed a plaintiff in a particularly humiliating or compromising situations. *See, e.g.*, *Sumes*, 938 F. Supp. at 13 (plaintiff was refused treatment while she was disrobed from the waist down, covered only by a hospital gown); *Jean-Baptiste*, 931 F. Supp. 2d at 4–8 (plaintiff suffered repeated instances of degrading sexual

harassment over a period of at least five months).   Pietrangelo identifies no such similar aggravators and readily admitted on cross-examination that his embarrassment was "internal" and not based on the conduct of a third party besides The Wing.  Bench Trial Tr. at 64:10–13.

At bottom, Pietrangelo proved that The Wing's denial of his application and advertising practices constituted violations of the DCHRA.   Humiliation and embarrassment naturally flow from such discrimination.   For those harms, this Court, following the lead of other courts, concludes that Pietrangelo is entitled to $1,000 in compensatory damages.  But Pietrangelo has fallen short of proving any aggravating circumstances that warrant enhancing that award—certainly not to the tune of his requested $4 million.

### 2. *Punitive Damages*

Under the DCHRA, "punitive damages are available in *all* discrimination cases . . . subject only to the general principles governing any award of punitive damages."  *Daka, Inc. v. Breiner*, 711 A.2d 86, 98 (D.C. 1998) (cleaned up).  A finding of discriminatory action alone is insufficient to warrant a punitive damages award absent "[a] showing of evil motive or actual malice."  *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 372 (D.C. 1993); *see also Rogers v. Ingersoll-Rand Co.*, 971 F. Supp. 4, 12 (D.D.C. 1997) ("Punitive damages are properly awarded where the act of the defendant is accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury.").  The requisite mental state "need not . . . be proven by direct evidence, but may be inferred from all the facts and circumstances of the case."  *Daka*, 711 A.2d at 99 (cleaned up).

Contrary to The Wing's assertion, *see* Defs.' Post-Trial Br. at 12, Pietrangelo has provided sufficient mental-state evidence for an award of punitive damages.  As the Court previously noted, The Wing "launched a multiyear advertising campaign promoting itself as a 'No Man's Land,'

posted jokes about men to its social-media accounts, and did not offer any evidence that a cisgender man was granted membership." *Pietrangelo*, 2023 WL 6388880, at *15. In addition, upon learning that the New York City Commission on Human Rights opened a sex-discrimination investigation against The Wing, Former CEO Audrey Gelman tweeted that "the Wing seems like it's gonna be O.K.: (Without men.)" and that the investigation has "only gotten [The Wing] more press." Pl.'s Statement of Material Facts ¶ 59(6), Dkt. 127-1. In the Court's view, all this evidence evinces a "willful disregard of the . . . rights" of men, who are a protected class under the DCHRA. *Rogers*, 971 F. Supp. at 12. Moreover, these statements undermine any defense that The Wing "lacked awareness of the DCHRA's prohibitions." *Pietrangelo*, 2023 WL 6388880, at *15 (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 537 (1999)). Indeed, Gelman's "garden-variety kook" comment—though not relevant to compensatory damages—evinces The Wing's continued failure, even after the start of this litigation, to take seriously the antidiscrimination mandate of the DCHRA. From this, the Court concludes that an award of punitive damages is appropriate to both punish and deter The Wing and other would-be offenders for ignoring the DCHRA and mocking those seeking to vindicate their civil rights.

As to the precise dollar amount, Pietrangelo seeks punitive damages double the value of compensatory damages—*i.e.*, $8 million for both DCHRA violations. *See* Mem. in Supp. of Pl.'s Damages at 1. As a constitutional threshold, "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425. Given that the Court will award $1,000 in compensatory damages, an $8 million award in punitive damages would undoubtedly violate the Due Process Clause—approximating a 8,000 multiplier.

The Court does, however, agree with Pietrangelo that a multiplier of two is reasonable. "[A]n award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)). As such, courts in other jurisdictions have approved a multiplier of one, or close to one, in comparable discrimination cases. *See, e.g.*, *Roberts v. United Parcel Serv., Inc.*, 115 F. Supp. 3d 344, 374 (E.D.N.Y. 2015) (using 1-to-1 ratio for claim of violation of New York City Human Rights Law); *Bivins v. Wrap it Up, Inc.*, No. 07-cv-80159, 2007 WL 3047122, at *8 (S.D. Fla. Oct. 18, 2007) (using 1-to-1 ratio for claims of violations of 42 U.S.C. § 1981 and Florida Civil Rights Act); *Rodriguez v. Gattuso*, 795 F. Supp. 860, 864 (N.D. Ill. 1992) (awarding three-fourths of the amount of compensatory damages for housing-discrimination claims in violation of 42 U.S.C. §§ 1982 and 3604(b)).

On at least one occasion, however, a judge in this District has awarded punitive damages with a multiplier of five for DCHRA violations. In *Dumpson v. Ade*, the plaintiff was the "first female, African-American student government president at American University." 2019 WL 3767171, at *1. One of the defendants unleashed a maelstrom of racist comments online about the plaintiff—including, "Racoons Rule, coons drool"; "Chimput!"; and "Waah, waah, Dats Rayceez!" *Id.* at *2. This harassment caused the plaintiff to "fear[] for her life and suffer[] both physically and mentally." *Id.* Her "academics and preparation for law school also suffered," and she missed exams and dropped her minor. *Id.* The plaintiff also "receiv[ed] regular psychiatric counseling" and was diagnosed with and received treatment for Post Traumatic Stress Disorder, "an eating disorder, depression, and anxiety." *Id.* Given the defendants' "outrageous conduct" that "resulted in liability for intentional infliction of emotional distress," the Court awarded the plaintiff $101,429.28 in compensatory damages and $500,000 in punitive damages. *Id.* at *7–8.

That case is distinguishable from Pietrangelo's.  To start, as discussed *supra*, he presented no mental-health evidence that could have revealed something about The Wing's mental state.  Nor did he bring a claim for intentional infliction of emotional distress.  And, in any event, the conduct in *Dumpson* is far more egregious than that here.  As such, a multiplier of five is not appropriate.

Given The Wing's violations of the DCHRA, aggressive marketing as a non-male space, and initial mockery of efforts to enforce antidiscrimination laws, the Court concludes that a multiplier of two is reasonable and no greater than necessary to achieve the goals of retribution and deterrence.  The Court will thus award Pietrangelo $2,000 in punitive damages.[4]

### 3.    *Reasonable Litigation Expenses*

Pietrangelo seeks reasonable litigation costs in connection with this suit, but this request is premature.  *See* Mem. in Supp. of Pl.'s Damages at 25–26.  Pietrangelo, as the "prevailing party[,] may serve and file a bill of costs" and must do so "within 21 days after entry of judgment terminating the case."  LCvR 54.1(a).  The Court has not entered final judgment.  When it does, Pietrangelo will have twenty-one days to file a bill of costs.

---

[4] The Wing notes that Pietrangelo did not introduce any evidence of The Wing's net worth and that, in any event, The Wing is not an ongoing concern.  *See* Defs.' Post-Trial Br. at 12–13. Evidence of a defendant's net worth may be relevant to an award of punitive damages.  *See Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 932 (D.C. 1995) ("[W]here a plaintiff seeks to recover punitive damages based on the wealth of the defendant, proof of the defendant's current net worth is required.").  Here, however, Pietrangelo's request for punitive damages is not based on The Wing's wealth; rather, he focuses on the award's traditional deterrence and retribution functions.  *See, e.g.*, Mem. in Supp. of Pl.'s Damages at 5.  Nor does The Wing present any authority suggesting that lack of net-worth evidence is a bar to recovering punitive damages, and the Court is unaware of any such barrier.  *Cf. Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79–83 (D.D.C. 2010) (awarding punitive damages against a defendant in default).  And, in any event, the Court's total damages award would not deplete The Wing's remaining assets.  *See* Decl. of Geoffrey Raicht ¶ 7, Dkt. 135-1 ("A nominal amount of money (approximately $6,000) remains in [Refresh Club, Inc.'s] bank account but any transfers out of this account have been frozen.").

## CONCLUSION

For the foregoing reasons, the Court dismisses as moot Pietrangelo's claims for injunctive and prospective declaratory relief but not his claim for retrospective declaratory relief.  In addition, the Court awards Pietrangelo $1,000 in compensatory damages and $2,000 in punitive damages. A separate order consistent with this decision accompanies this memorandum opinion.


_____
DABNEY L. FRIEDRICH
United States District Judge

July 12, 2024